**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| VHT, INC., a Delaware corporation, *Plaintiff-Appellee/ Cross-Appellant*, | Nos. 17-35587 17-35588 |
| v. | D.C. No. 2:15-cv-01096- JLR |
| ZILLOW GROUP, INC., a Washington corporation; ZILLOW, INC., a Washington corporation, *Defendants-Appellants/ Cross-Appellees*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, Senior District Judge, Presiding

Argued and Submitted August 28, 2018
Seattle, Washington

Filed March 15, 2019

Before: M. Margaret McKeown, William A. Fletcher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Copyright Law

The panel affirmed in part and reversed in part the district court's judgment after a jury trial and remanded in a copyright infringement action brought by VHT, Inc., a real estate photography studio, against Zillow Group, Inc., and Zillow, Inc., an online real estate marketplace.

VHT alleged that Zillow's use of photos on the "Listing Platform" and "Digs" parts of its website exceeded the scope of VHT's licenses to brokers, agents, and listing services that provided those photos to Zillow. The district court granted partial summary judgment on a limited set of claims. The jury found in favor of VHT on most remaining claims, awarding over $8.27 million in damages. The district court partially granted Zillow's post-trial motion for judgment notwithstanding the verdict, reversing in part the jury verdict and reducing total damages to approximately $4 million.

The panel affirmed the district court's summary judgment in favor of Zillow on direct infringement of the Listing Platform photos. The panel held that VHT failed to establish that Zillow engaged in volitional conduct by exercising control over the content of the Listing Platform.

With respect to direct liability on the Digs photos, the panel affirmed the district court's grant in favor of Zillow of judgment notwithstanding the verdict on 22,109 non-displayed photos and 2,093 displayed but not searchable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

photos. The panel held that VHT did not present substantial evidence that Zillow, through the Digs platform, directly infringed its display, reproduction, or adaption rights.

The panel upheld summary judgment in favor of VHT on 3,921 displayed, searchable Digs photos. The panel held that fair use did not absolve Zillow of liability because Zillow's tagging of the photos for searchable functionality was not a transformative fair use.

The panel affirmed the district court's grant in favor of Zillow of judgment notwithstanding the verdict on secondary liability, both contributory and vicarious, on the Digs photos.

As to damages, the panel remanded consideration of the issue whether VHT's photos used on Digs were part of a compilation or were individual photos.

The panel reversed the district court's denial of judgment notwithstanding the verdict on the issue of willfulness and vacated the jury's finding on willfulness. The panel concluded that substantial evidence did not show that Zillow was "actually aware" of its infringing activity, nor that Zillow recklessly disregarded or willfully blinded itself to its infringement.

---

**COUNSEL**

Ian B. Crosby (argued), Edgar G. Sargent, Genevieve Vose Wallace, and Jenna G. Farleigh, Susman Godfrey LLP, Seattle, Washington, for Defendants-Appellants/Cross-Appellees.

Stephen M. Rummage (argued), Marcia B. Paul, Jonathan M. Lloyd, James E. Howard, and Max B. Hensley, Davis Wright Tremaine LLP, Seattle, Washington, for Plaintiff-Appellee/Cross-Appellant.

Keith Kupferschmid and Terry Hart, Copyright Alliance, Washington, D.C.; Eleanor M. Lackman and Lindsay W. Bowen, Cowan, DeBaets, Abrahams & Sheppard LLP, New York, New York; for Amicus Curiae Copyright Alliance.

Alicia Calzada, Alicia Wagner Calzada, PLLC, San Antonio, Texas, for Amici Curiae The American Society of Media Photographers, Inc., Digital Media Licensing Association, Inc., Graphic Artist Guild, Inc., and National Press Photographers Association, Inc.

Thomas G. Hentoff and Chanakya A. Sethi, Williams & Connolly LLP, Washington D. C., for Amici Curiae Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, and Recording Industry Association of America, Inc.

Mitchell L. Stoltz, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

Brian M. Willen, Wilson Sonsini Goodrich & Rosati, P.C., New York, New York; Ryan T. O'Hollaren, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California; for Amici Curiae Internet Association and Computer & Communications Industry Association.

**OPINION**

McKEOWN, Circuit Judge:

Zillow, an online real estate marketplace, has become a popular website for homeowners and others to check estimated valuations of their property, look for houses and condominiums for sale and rent, and see photographs of a wide range of properties. Thousands of those copyrighted photos come from VHT, the largest professional real estate photography studio in the country.

The copyright claims on appeal concern Zillow's use of VHT's photos on two parts of Zillow's website: the "Listing Platform" and "Digs." The Listing Platform is the core of the website, featuring photos and information about real estate properties, both on and off the market. Zillow claims that the site includes "most homes in America." Digs features photos of artfully-designed rooms in some of those properties and is geared toward home improvement and remodeling. Zillow tags photos on the Listing Platform so that Digs users can search the database by various criteria, like room type, style, cost, and color.

Real estate brokers, listing services, and agents hire VHT to take professional photos of new listings for marketing purposes. A VHT photographer takes the photos and sends them to the company's studio for touch-up, where they are saved to VHT's electronic photo database, and then delivered to the client for use under license. Each license agreement between VHT and its clients differs slightly, but each contract generally grants the requesting client the right to use the photos in the sale or marketing of the featured property. Zillow receives these photos and other data in feeds from various real estate-related sources.

In 2015, VHT sued Zillow Group, Inc., and Zillow, Inc., (collectively "Zillow") for copyright infringement, alleging that Zillow's use of photos on the Listing Platform and Digs exceeded the scope of VHT's licenses to brokers, agents, and listing services who provided those photos to Zillow. The district court granted partial summary judgment on a limited set of claims, while other claims advanced to trial. The jury found in favor of VHT on most remaining claims, awarding over $8.27 million in damages. The district court partially granted Zillow's post-trial motion for judgment notwithstanding the verdict, reversing in part the jury verdict and reducing total damages to approximately $4 million.

The parties cross-appealed issues stemming from partial summary judgment, the jury verdict, and judgment notwithstanding the verdict. We affirm in part and reverse in part.[1]

To simplify and make sense of the various claims, this opinion does not split out the appeal and cross-appeal as was done in the briefing to the court. Instead, the opinion separately addresses liability for each of the categories of photos at issue, followed by a discussion of damages. In view of the multiple theories of liability and categories of photos, following is an overview of the opinion.

---

[1] In connection with these proceedings, we received amicus curiae briefs from a broad array of interested parties, including nonprofit groups and associations representing a diverse set of industry, technology, and artistic interests. The briefs were helpful to our understanding of the implications of this case from various points of view. We thank amici for their participation.

I.   Direct Infringement
     A.  Direct Infringement—Listing Platform Photos
     B.  Direct Infringement—Digs Photos
         1.  Jury Verdict—Direct Infringement
         2.  Summary Judgment—Fair Use re Searchable Photos
             a.  Background on Fair Use
             b.  Evolution of Search Engine Cases
             c.  Application of Fair Use Principles
II.  Secondary Infringement—Digs
     A.  Contributory Liability
     B.  Vicarious Liability
III. Damages
     A.  Compilation
     B.  Willfulness
IV.  Conclusion

## ANALYSIS

The heart of this dispute is Zillow's copyright liability for use of VHT photos.  VHT argues that Zillow directly infringed its copyrighted photos, both those on the Listing Platform and Digs.  VHT also argues that Zillow indirectly infringed through use of the photos on Digs.  These claims pertain to different images, focus on different features of Zillow's website, and have different procedural postures, so we consider the various categories of photos separately.

## I.  Direct Infringement

VHT's key claim is that Zillow is directly liable for infringing VHT's copyright on photos that were posted on the Listing Platform and Digs.  To prevail on a claim of direct copyright infringement, VHT must establish "ownership of the allegedly infringed material" and that Zillow "violate[d] at least one exclusive right granted to"

VHT under 17 U.S.C. § 106. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). It is undisputed that VHT is the copyright holder of the allegedly infringed photos and therefore has the exclusive right to reproduce, adapt, and display them.**[2]** 17 U.S.C. § 106.

VHT must also establish causation, which is commonly referred to as the "volitional-conduct requirement." *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017). As we set out in *Giganews*—decided on the first day of the VHT/Zillow trial and the closest circuit precedent on point—"volition in this context does not really mean an act of willing or choosing or an act of deciding"; rather, "it simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Id.* (internal citations omitted). Stated differently, "*direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement." *Id.* (citation omitted). This prerequisite takes on greater importance in cases involving automated systems, like the Zillow website.

In addressing this concept, Justice Scalia noted that "[e]very Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted [the volitional-conduct] rule." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 453 (2014) (Scalia, J., dissenting).**[3]** He went on to explain that while "most direct-

---

**[2]** VHT does not appeal the district court's finding that there was insufficient evidence that Zillow violated VHT's distribution rights.

**[3]** Although the majority opinion in *Aereo* does not reference the volitional-conduct requirement, Justice Scalia's dissent offers instructive background on the doctrine. In *Giganews*, we embraced the principle

infringement cases" do not present this issue, "it comes right to the fore when a direct-infringement claim is lodged against a defendant who does nothing more than operate an automated, user-controlled system. . . . Most of the time that issue will come down to who selects the copyrighted content: the defendant or its customers." *Id.* at 454–55 (internal citations omitted).

*Giganews*, *Aereo*, and out-of-circuit precedent counsel that direct copyright liability for website owners arises when they are *actively involved* in the infringement. "'[T]he distinction between active and passive participation'" in the alleged infringement is "'central'" to the legal analysis. *Giganews*, 847 F.3d at 667 (quoting *Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1160 (C.D. Cal. 2015)).

That "direct" infringement requires "active" involvement is hardly surprising, given the correlation between the words "active" and "direct." As the Fourth Circuit held, "[t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). By contrast, activities that fall on the other side of the line, such as "'automatic copying, storage, and transmission of copyrighted materials, when instigated by others, do[] not render an [Internet service provider] strictly liable for copyright infringement[.]'" *Giganews*, 847 F.3d at 670 (quoting *CoStar*, 373 F.3d at 555).

---

and held that it is "consistent with the *Aereo* majority opinion," which left the requirement "intact." 847 F.3d at 666–67.

In other words, to demonstrate volitional conduct, a party like VHT must provide some "evidence showing [the alleged infringer] exercised control (other than by general operation of [its website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution" of its photos. *Id.* at 666, 670. VHT failed to satisfy that burden with respect to either the photos on the Listing Platform or on Digs.

### A. Direct Infringement—Listing Platform Photos

VHT asserted that Zillow directly infringed the photos displayed on the Listing Platform after a real estate property was sold because VHT's license agreements only authorized use of those photos in relation to the sale of the property. This claim, involving 54,257 non-searchable photos, was resolved on summary judgment. The Listing Platform is the core of Zillow's online real estate marketplace. It features photos and information about properties, which Zillow receives through digital feeds from real estate agents, brokerages, and multiple listing services, among others (collectively "feed providers").

Zillow has agreements with its feed providers granting it an express license to use, copy, distribute, publicly display, and create derivative works from the feed data on its websites. Feed providers represent that they "ha[ve] all necessary rights and authority to enter into" the agreements, and that "Zillow's exercise of the rights granted [t]hereunder will not violate the intellectual property rights, or any other rights of any third party."

These agreements provide Zillow with either "evergreen" or "deciduous" rights in the photos provided through the feeds. An evergreen right permits use of a photo

without any time restriction, "on and in connection with the operation, marketing and promotion of the web sites and other properties, owned, operated or powered by Zillow or its authorized licensees." By contrast, a deciduous right is temporally limited: Zillow may use the photo when the real-estate listing for its corresponding property is active, but once the listing is removed (for example, when the property sells), the photo must be taken down from Zillow's websites. To treat each photo consistently with its deciduous or evergreen designation, Zillow developed automated "trumping" rules to determine which photos to display on the Listing Platform.

VHT argues that Zillow "designed its system to . . . cause[] the reproduction, display, and adaptation of VHT photographs post-sale on the Listing Platform," and "chose to simply ignore VHT's notices that post-sale use was beyond the scope of VHT's licenses." The district court granted summary judgment to Zillow, concluding that it did not engage in volitional conduct and therefore did not directly infringe VHT's copyrights in 54,257 photos by displaying them on the Listing Platform after a real estate property was sold.

On de novo review, we agree with the district court's analysis and affirm. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003). Although the district court did not have the benefit of *Giganews* at the time of summary judgment, its careful reasoning was prescient in invoking the same principles.

Zillow did not engage in volitional conduct necessary to support a finding of direct liability. The content of the Listing Platform is populated with data submitted by third-party sources that attested to the permissible use of that data,

and Zillow's system for managing photos on the Listing Platform was constructed in a copyright-protective way. The feed providers themselves select and upload every photo, along with the evergreen or deciduous designations, that wind up on the Listing Platform. As a result, the photos on the Listing Platform were not "selected" by Zillow. *See Giganews*, 847 F.3d at 670. Nor did Zillow "exercise[] control" over these photos beyond the "general operation of [its website]." *Id.* Zillow required feed providers to certify the extent of their rights to use each photo. Consistent with these designations, Zillow's system classified each photo as deciduous or evergreen and programmed its automated systems to treat each photo consistently with that scope of use certified to by the third party.

Further, when multiple versions of the same photo were submitted through the various feeds, Zillow invoked its copyright-protective "trumping" rules. For example, one rule might prefer a photo provided by an agent over one provided by a multiple listing service, and another might prefer a local broker to an international one. Zillow used a rule that gave preference to photos with evergreen rights over photos with deciduous rights in the same image. As the district court recognized, "trumping" is a reasonable way to design a system to manage multiple versions of the same photo when the authorized use varies across versions. These rules, along with other features of the system, facilitate keeping the photos with evergreen rights on the website and removing the photos with deciduous rights once a property has sold. Thus, Zillow actively designed its system to avoid and eliminate copyright infringement.

Notably, VHT's argument is primarily cast in terms of Zillow facilitating or enabling infringement by VHT's clients that are Zillow's feed providers. But this type of

claim more properly falls in the category of secondary infringement, a claim not advanced by VHT with respect to the Listing Platform photos.

VHT also asserts that Zillow failed to remove photos once it received notice that infringing content was on the Listing Platform, a conscious choice that amounts to volitional conduct on Zillow's part. This claim is unavailing because, once VHT put Zillow on notice of claimed infringement, Zillow took affirmative action to address the claims. Additionally, VHT's assertion that it "repeatedly notified Zillow that it was infringing" is unsupported in the record.

In July 2014, VHT sent Zillow a takedown notice letter with a list of thousands of allegedly infringing photos by residential street address (but not by web address). Zillow promptly requested all executed license agreements between VHT and the feed providers who had provided photos to Zillow, as well as license agreements between VHT and its photographers, so that Zillow could evaluate whether VHT possessed exclusive rights to the photos on the Listing Platform. VHT responded with an unsigned form contract, which it stated was used with many feed providers, but which was not tied to any specific photos on Zillow's website. Zillow again reiterated its need to see the specific contracts governing the contested photos. Instead of responding with the contracts, VHT filed suit. Zillow's reasonable response to VHT's single formal inquiry (supplemented in a follow-on email) can hardly be characterized as rising to the level of volitional conduct or turning a blind eye.

In sum, VHT failed to "provide[] . . . evidence showing [Zillow] exercised control (other than by general operation

of [its website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution" of these photos. *See Giganews*, 847 F.3d at 670; *see also CoStar*, 373 F.3d at 555. Thus, we affirm the district court and conclude Zillow did not directly infringe VHT's copyrights in photos displayed on the Listing Platform post-sale.

## B. Direct Infringement—Digs Photos

VHT also claimed that Zillow directly infringed thousands of photos used on Digs. The jury concluded that Zillow directly infringed 28,125 photos and rejected its fair use defense. Following trial, the district court granted in substantial part Zillow's motion for judgment notwithstanding the verdict on the ground that insufficient evidence supported Zillow's direct infringement of 22,109 photos that were not displayed on Digs and 2,093[4] photos that were displayed but not searchable on Digs.

By contrast, the court upheld the jury's determination that Zillow directly infringed a set of 3,921 images that were selected and tagged by Zillow moderators for searchable functionality and displayed on Digs. Zillow does not appeal this ruling. However, Zillow argues that fair use insulates it from liability as to this subset of photos. The jury was instructed not to consider this legal theory as to these photos because the district court had determined pretrial that, as a matter of law, the searchability function did not constitute fair use. It is that summary judgment ruling that Zillow challenges on appeal. Because we agree with the district

---

[4] The displayed but non-searchable set includes 2,094 photos. The district court affirmed the jury verdict with respect to one of those photos, which Zillow also distributed via email.

court that the fair use defense does not absolve Zillow of direct liability for these searchable photos, this portion of the jury verdict remains intact.

The following chart clarifies the status of the Digs photos relevant to the direct infringement claims.

| Photos | Jury Verdict | Post-Trial Determination | Party Bringing Appeal |
|---|---|---|---|
| 22,109 not displayed[5] | Direct infringement | Overturned jury verdict | VHT |
| 2,094 displayed, not searchable | Direct infringement | Overturned jury verdict (except 1 email photo) | VHT |
| 3,921 displayed, searchable | Direct infringement | Upheld jury verdict | Zillow: direct infringement not appealed; appeals only summary judgment on no fair use |
| 1 blog post photo (not on Digs) | Direct infringement | Upheld jury verdict | Not appealed |

---

[5] Searchable photos numbered 1,694; 20,415 photos were not searchable.

### 1. Jury Verdict—Direct Infringement

VHT's claim that Zillow directly infringed photos on Digs went to the jury. The jury verdict form was framed in general terms, asking only whether "VHT has proven its direct copyright infringement claim as to one or more of the VHT Photos[.]" The jury answered "yes," and was asked to specify how many VHT photos were directly infringed. The jury answered "28,125"—in other words, all of them. However, the jury was not asked to specify which copyright rights—display, reproduction, or adaption—were infringed.[6] Following trial, Zillow moved for judgment notwithstanding the verdict or for a new trial. The task fell to the district court to examine the evidence as to each right.

On de novo review, "we apply the same standard used by the district court in evaluating the jury's verdict" and uphold the verdict unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007); Fed. R. Civ. P. 50(a). Specifically, we "ask[] whether the verdict is supported by substantial evidence," "which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984, 991 (9th Cir. 2017) (quotation and citation omitted). Given the sanctity of the jury process, we undertake this review with special care and reluctance to overturn a verdict. However, because the verdict here did not meet this standard, we affirm the district court's grant of Zillow's motion for judgment notwithstanding the verdict

---

[6] As noted earlier, the distribution right was not contested and is not an issue on appeal.

with respect to direct infringement of 22,109 non-displayed photos and 2,093 displayed but not searchable photos.

We first consider display rights. As background for our analysis, it is useful to consider the direct infringement by Zillow that the district court upheld and that Zillow did not appeal. The district court found substantial evidence that Zillow directly infringed VHT's display rights in 3,921 photos displayed on Digs that Zillow moderators selected and tagged for searchable functionality. Based on testimony, charts, and statistics, the court found that "the jury could have reasonably concluded that users accessed those images through Digs's search function." The court went on to reason that "the jury could have reasonably concluded that Zillow's moderation efforts, which rendered those images searchable, proximately caused the copying." Put differently, active conduct by Zillow met the volitional-conduct requirement for direct infringement. Zillow does not appeal this ruling upholding the jury's verdict as to the 3,921 displayed, searchable photos.

On appeal, VHT attempts to shoehorn an additional 1,694 photos into this category. This effort falls flat both as a factual and legal matter because substantial evidence does not support direct infringement of VHT's display rights in the 1,694 searchable images that were not displayed.

VHT posits that the jury could have found that these photos were displayed because of circumstantial evidence and because Zillow failed to record whether they were displayed. Not so. This argument is foreclosed by the parties' stipulated spreadsheet that categorized each photo. The column labeled "DISPLAYED" included an entry for "Y" (yes) or "N" (no). The jury was instructed to "treat every fact on this spreadsheet as proven," so VHT cannot

recast the facts retroactively and now claim that 1,694 searchable images stipulated as "N[OT] DISPLAYED" *were in fact* displayed or made available for display. Up is not down.

VHT's contention that the jury could have reasonably inferred that Zillow made "available for public display" all 22,109 "N[OT] DISPLAYED" images similarly fails. This theory presumes that the Copyright Act's display right encompasses an exclusive right to "make available for display," a position neither supported by the statute nor embraced by this court. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) ("[B]ased on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory."); 17 U.S.C. § 101 ("To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially."). To be sure, the Copyright Office notes that the outer limits of the public display right have yet to be defined. U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES 47–51 (Feb. 2016), https://www.copyright.gov/docs/making_available/making-available-right.pdf.

What is most important here, though, is that VHT's argument comes too late. The jury was never instructed on the "made available" theory, nor did VHT raise this issue in its proposed jury instructions or in objections to the final instructions. *See Sinclair v. Long Island R.R.*, 985 F.2d 74, 78 (2d Cir. 1993) ("the verdict . . . cannot be sustained on a theory that was never presented to the jury"); *Ramona Equip.*

*Rental, Inc. ex rel. U.S. v. Carolina Cas. Ins. Co.*, 755 F.3d 1063, 1070 (9th Cir. 2014) (an argument raised for first time in a post-trial motion is waived). For these reasons, substantial evidence did not support a finding of direct infringement of VHT's public display rights in these 22,109 photos.

Zillow also did not violate VHT's display rights in 2,093 displayed, non-searchable photos. These are photos that Digs users copied to "personal boards" and "Implicit Digs," but which Zillow did not add to the searchable set.

A "personal board" is a bespoke digital bulletin board of images that a user saves or uploads from the Listing Platform. Users can also upload their own images. These boards are typically private, though users can share a link to their boards. When a user saves a copy of an image with evergreen rights to a personal board, that image automatically joins a queue for review by a Zillow moderator. The moderator then decides whether to designate the photo for tagging so that it can be searchable on Digs, and thus select it for public display. Not all photos that are in the queue for moderation are reviewed. Additionally, in some instances, a user starts but does not finish the process of saving an image to this board. Beginning in 2014, Zillow programmed these "clicked to save" images—called "Implicit Digs"—to enter the queue for moderator review in the same manner as if the photo had been saved to a personal board.

According to VHT, the jury could have found that Zillow "caused the [2,093] images to be displayed . . . by subjecting the non-searchable VHT Photos to the potential for moderation." This argument defies logic because the only display that occurred was triggered by the user. Any

potential for future display is purely speculative. As the district court explained, the *possibility* that images might be moderated and tagged—conduct that is volitional—is not sufficient "to transform Zillow from a 'passive host' to a 'direct[] cause' of the display of VHT's images."

Next, we consider VHT's exclusive reproduction and adaption rights in the 2,093 displayed, non-searchable photos. The Copyright Act grants copyright holders the exclusive right "to reproduce the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). Direct infringement of the reproduction right "requires copying *by* the defendant, . . . which [requires] that the defendant cause the copying." *Fox Broad. Co., Inc. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014) (quotation and citation omitted). The adaptation right is the exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Following *Giganews*, we conclude that Zillow's automated processes storing or caching VHT's photos are insufficiently volitional to establish that Zillow directly infringed VHT's reproduction and adaption rights in these non-searchable photos. Unlike photos that Zillow curated, selected, and tagged for searchable functionality—activities that amount to volitional conduct establishing direct liability—these 2,093 photos were copied to "personal boards" and "Implicit Digs" based on *user* actions, not the conduct of Zillow or its moderators.

Any volitional conduct with respect to these photos was taken by the users, not Zillow. Users, not Zillow, "selecte[d]" images to add to their personal boards and "instigate[d]" the automatic caching process by saving a particular image. *See Giganews*, 847 F.3d at 670. This arrangement is important because courts have found no direct liability where an online system "responds

automatically to users' input . . . without intervening conduct" by the website owner. *CoStar*, 373 F.3d at 550; *see also Giganews*, 847 F.3d at 670. Under these conditions, courts have analogized online facilities, like Internet service providers, to a copy machine owner, who is not liable "[w]hen a customer duplicates an infringing work." *CoStar*, 373 F.3d at 550.

Additionally, Zillow's behind-the-scenes technical work on Digs photos is not evidence that Zillow "selected any material for upload, download, transmission, or storage." *Giganews*, 847 F.3d at 670. Zillow produced cached copies of these Digs images, a process that automatically trims or pads images whose height and width did not match the target resolution, for the purposes of accelerating website speed. This activity does not amount to volitional conduct. Nor can Zillow's promotion of Digs, including encouraging users to share photos through its site, be seen as "instigat[ing]" user copying. *Id.*

Zillow's conduct with respect to these photos amounts to, at most, passive participation in the alleged infringement of reproduction and adaption rights and is not sufficient to cross the volitional-conduct line. As in cases involving Internet service providers, Zillow "affords its [users] an Internet-based facility on which to post materials, but the materials posted are of a type and kind selected by the [user] and at a time initiated by the [user]." *CoStar*, 373 F.3d at 555. Zillow did not directly infringe VHT's reproduction

and adaptation rights in the 2,093 displayed, non-searchable photos.**7**

*          *          *

In sum, VHT did not present substantial evidence that Zillow, through the Digs platform, directly infringed its display, reproduction, or adaption rights in 22,109 not displayed photos and 2,093 displayed but non-searchable photos. We affirm the district court's grant of judgment notwithstanding the verdict as to these photos. We now turn to Zillow's fair use defense to direct infringement of 3,921 displayed, searchable photos.

### 2. Summary Judgment—Fair Use re Searchable Photos

Zillow does not appeal the jury's finding of direct infringement with respect to the 3,921 displayed, searchable photos, but does assert a fair use defense for those photos. Zillow contends that Digs' searchable functionality constitutes fair use, which the district court rejected as a matter of law at summary judgment.

We recount the somewhat unusual history of the fair use issue in the proceedings below. On summary judgment, the district court rejected Zillow's argument that "the images that it has made searchable on Digs" are protected by fair use and instead "conclude[d] as a matter of law that Digs' searchable functionality does not constitute a fair use." At trial, the jury was generally instructed to consider the fair use

---

**7** The same analysis applies to any potential violation of VHT's exclusive reproduction and adaption rights in the 22,109 photos that were not displayed.

defense as to all VHT photos used on Digs that it found Zillow had directly or indirectly infringed. However, this set of photos was carved out for separate treatment. The jury considered only whether "reproduction, cropping, and scaling" of these photos constituted fair use because the court instructed the jury that the court "ha[d] determined, and you are to take as proven, that the Digs searchable functionality does not constitute fair use." After finding that Zillow directly infringed all 28,125 VHT photos used on Digs, the jury rejected Zillow's fair use affirmative defense for all photos.

The district court upheld the jury's fair use verdict, which Zillow does not appeal. Rather, Zillow's appeal reaches back to the district court's summary judgment ruling to argue that the Digs' *searchable* functionality is fair use as a matter of law, and, as a result, Zillow bears no liability for the 3,921 searchable and displayed photos. We review de novo the district court's grant of summary judgment to VHT on this mixed question of law and fact. *Kelly*, 336 F.3d at 817.

### a. Background on Fair Use

Protection of copyrighted works is not absolute. "The fair use defense permits the use of copyrighted works without the copyright owner's consent under certain situations." *Amazon*, 508 F.3d at 1163. Fair use both fosters innovation and encourages iteration on others' ideas, "thus providing a necessary counterbalance to the copyright law's goal of protecting creators' work product." *Id.*; *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575–76 (1994). Fair use also aligns with copyright's larger purpose "'[t]o promote the Progress of Science and useful Arts,' . . . and to serve 'the welfare of the public.'" *Amazon*, 508 F.3d

at 1163 (quoting U.S. Const. art. I, § 8, cl. 8, and *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 n.10 (1984)).

Fittingly enough, a case involving a biography of George Washington serves as a foundational source of fair use in American law. *Folsom v. Marsh*, 9 F. Cas. 342 (D. Mass. 1841) (No. 4901). Justice Story's narrative description of copyright doctrine in that case "distilled the essence of law and methodology from the earlier cases" and provided the conceptual basis for the judge-made fair use doctrine. *Campbell*, 510 U.S. at 576. Although the 1976 Copyright Act codified those principles, it did little to elaborate on Justice Story's description or to clarify application of the factors. With minimal guidance or elucidation, Congress set forth four factors for courts to consider when determining whether the use of a copyrighted work is a "fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Given license to apply these factors flexibly and to consider them in their totality, courts have been bedeviled by the fair use inquiry. *See Campbell*, 510 U.S. at 577–78. Fair use has been called "the most troublesome [doctrine] in the whole law of copyright" and commentators have criticized the factors as "billowing white goo." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170–71 (9th Cir. 2012) (citations and quotations omitted). In a (still ongoing) effort to adapt the fair use analysis to a myriad of circumstances, courts have embellished and supplemented the factors. For example, the concept of "transformativeness" is found nowhere in the statute, but appeared for the first time in the Supreme Court in *Campbell*, where the Court endeavored to refine and crystalize the first statutory factor: the "purpose and character of the use."[8] 510 U.S. at 579. The animating purpose of the first factor is to determine,

> in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

---

[8] The concept of transformative use had appeared in earlier lower court decisions, *e.g.*, *Twin Peaks Prods., Inc. v. Publ'ns Intern., Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993) ("[I]t is not uncommon for works serving a fair use purpose to give at least a brief indication of the plot. . . . In identifying plot, the author of the second work may or may not be said to have made . . . a 'transformative' use. . . . Such use would occur, for example, if a plot was briefly described for purposes of adding significant criticism or comment about the author's plotting technique.").

*Id.* (citations omitted). Because transformation advances copyright's core goals, "the more transformative the new work, the less will be the significance of other factors." *Id.* Likewise, despite the absence of a textual hook, public purpose also has been read into the statute. *See Amazon*, 508 F.3d at 1166; *Kelly*, 336 F.3d at 820. While we can discern certain animating principles bridging cases in this area, the doctrine has hardly followed a straight, or even slightly curved, line.

The focus of the parties' debate here is whether Zillow's tagging of 3,921 VHT photos for searchable functionality on Digs was transformative and thus supported a finding of fair use. The purpose of Digs is to permit users to search for certain attributes or features, such as a marble countertop or hardwood floor, and view photos of rooms with those attributes or features. These photos are either uploaded by users to Digs, or selected manually or electronically by Zillow. Zillow then tags the photos to make them searchable. Of course, tagging makes it possible for a user's keyword search to produce relevant results. Zillow refers to these tagged photos as "searchable images" or components of the "searchable set." VHT's 3,921 photos are in the searchable set.

Zillow contends that Digs is effectively a search engine, which makes its use of VHT's photos transformative, and therefore fair use. VHT responds that this is not fair use because Digs is not a search engine and the tagging for searchable functionality is not transformative. Dueling "search engine" characterizations do not resolve fair use here. Instead, we step back and assess the question holistically, as we have been instructed to do by the statute and the Supreme Court. We consider the reality of what is

happening rather than resorting to labels. To do that, it is helpful to recount the history of the search engine cases.

### b.  Evolution of Search Engine Cases

Over the past two decades, search engines have emerged as a significant technology that may qualify as a transformative fair use, making images and information that would otherwise be protected by copyright searchable on the web. *See Amazon*, 508 F.3d at 1166–67; *Kelly*, 336 F.3d at 818–22. In assessing fair use in the context of search engines, courts have relied heavily on the first fair use factor, and in particular "whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (citation and quotation omitted); *see also Amazon*, 508 F.3d at 1164 (explaining the *Kelly* court relied "primarily" on the first fair use factor when conducting its analysis); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220–221, 223 (2d Cir. 2015) (offering a relatively abbreviated consideration of the remaining three fair use factors, all of which were informed by its analysis of the first factor).

In an early opinion applying fair use principles in the digital age, we held that the now-defunct search engine Arriba's creation and use of thumbnail versions of a professional photographer's copyrighted images was fair use because the "smaller, lower-resolution images . . . served an entirely different function than [the] original images." *Kelly*, 336 F.3d at 815, 818. The original images served an artistic or aesthetic purpose. *Id.* at 819. By contrast, the thumbnail images, which were provided in response to a user's search query, were incorporated into the search engine's overall function "to help index and improve access to images on the internet and their related web sites." *Id.* at 818. Investing the images with a new purpose made Arriba's use

transformative, not superseding.  Indeed, the thumbnail versions could not supersede the original use because the thumbnails were grainy and low-resolution when enlarged. *Id.*  Additionally, Arriba's use of the thumbnail images "promote[d] the goals of the Copyright Act and the fair use exception" because they "benefit[ed] the public by enhancing information-gathering techniques on the internet." *Id.* at 820.  Just as *Campbell* had drawn out the principle of transformation from the first statutory factor, we drew out the principle of public benefit.

Building on our reasoning in *Kelly*, in *Amazon* we held that Google's use of thumbnail images in its search engine is "highly transformative" and thus fair use.  508 F.3d at 1163–65.  As in *Kelly*, we concluded that "a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool." *Id.* at 1165.  On a scale much greater than the search engine at issue in *Kelly*, Google "improve[s] access to images on the internet and their related web sites" by "index[ing]" the internet and linking to the original source image generated in the search results.  *Kelly*, 336 F.3d at 815–16, 818.  By using the thumbnail images in service of the search engine, Google "transforms the image," which might have been created for an "entertainment, aesthetic, or informative function," "into a pointer directing a user to a source of information." *Amazon*, 508 F.3d at 1165.  As a result of the new function that the image serves, Google's use of the entire image in its search engine results "does not diminish the transformative nature of [its] use." *Id.*  And, further developing the public benefit principle from *Kelly*, we emphasized that Google's search engine both "promotes the purposes of copyright and serves the interests of the public," which significantly outweighed the superseding or

commercial uses of the search engine, and strongly supported finding fair use. *Id.* at 1166.

More recently, the Second Circuit considered whether fair use protected the Google Books search engine, which employs digital, machine-readable copies of millions of copyright-protected books scanned by Google. *Authors Guild*, 804 F.3d at 207–08.[9] The Google Books search engine enables a full text search, which makes possible searching for a specific term, and then provides "snippets," or a part of a page, for users to read. *Id.* at 208–09, 216–17. The court held that both functions involve a "highly transformative purpose of identifying books of interest to the searcher." *Id.* at 218. The search function "augments public knowledge by making available information *about* Plaintiffs' books without providing the public with a substantial substitute." *Id.* at 207. And the search engine makes possible a new type of research known as "text mining" or "data mining," whereby users can search across the corpus of books to determine the frequency of specified terms across time. *Id.* at 209, 217. Additionally, the "snippet" view provides context for users to assess if a book is relevant to them, without providing so much context as to supersede the original. *Id.* at 218. To boot, Google often provides a link to a page where the entire book can be found at a library or purchased. *Id.* at 209. Concluding that Google's commercial motivation did not significantly outweigh these transformative uses, the court held that the first factor strongly supported a finding of fair use. *Id.* at 219.

---

[9] The Google Books search engine also featured millions of public domain texts. For obvious reasons, fair use was not at issue with those works.

What we divine from these cases is that the label "search engine" is not a talismanic term that serves as an on-off switch as to fair use. Rather, these cases teach the importance of considering the details and function of a website's operation in making a fair use determination. We now examine Digs with those lessons in mind.

### c. *Application of Fair Use Principles*

As noted, the first factor assesses the character of the use, including whether it is commercial in nature, and, critically, whether it is "transformative." There is no dispute that Zillow's use is for commercial purposes, a factor we cannot ignore. To determine if that use is transformative, we consider whether and to what extent it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" *Campbell*, 510 U.S. at 579. Though we agree that Digs is a type of search engine because it offers searchable functionality, it is qualitatively different than Google and other open-universe search engines, as well as different than the Google Books search engine.

Most simply, a search engine is a software program that enables information retrieval by helping users find information through the use of keyword queries. But not all search engines are created equal. The search engines commonly used for day-to-day research are internet-wide search engines, like Google, Yahoo, or Bing. These search engines are programs powered by algorithms that search or "crawl" the web. A search engine like Google then indexes websites, stores them on a database, and runs users' search queries against it. Search results are typically a mix of images and text, which include hyperlinks to sources of that content elsewhere on the web. *Amazon*, 508 F.3d at 1155.

Unlike the internet-wide search engines considered in *Amazon* and *Kelly*, Digs is a closed-universe search engine that does not "crawl" the web. Users can run searches on the "searchable set" of images within Digs' walled garden, which includes VHT photos. The search results do not direct users to the original sources of the photos, such as VHT's website. Rather, they link to other pages within Zillow's website and, in some cases, to third-party merchants that sell items similar to those featured in the photo.

That Digs makes these images searchable does not fundamentally change their original purpose when produced by VHT: to artfully depict rooms and properties. Additionally, Digs displays the entire VHT image, not merely a thumbnail. Unlike in *Amazon*, the new image does not serve a "different function" than the old one. *Amazon*, 508 F.3d at 1165. Zillow's use preserves the photos' "inherent character." *Monge*, 688 F.3d at 1176. And Zillow "simply supersed[es] [VHT's] purpose" in creating the images in the first place. *Kelly*, 336 F.3d at 819–20; *see Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550–51 (1985) (holding that if a new work "supersede[s] the use of the original," it is probably not a fair use).

Comparing Digs to the Google Books search engine further drives home this analysis. We agree with the Second Circuit's observation that the copyright dispute over the Google Books search engine "tests the boundaries of fair use." *Authors Guild*, 804 F.3d at 206. We conclude that Digs goes one step further—and crosses the line.

Like Digs, the Google Books search engine operates on a closed database comprised of complete digital copies of original works. *Id.* at 217. But the similarities end there.

The Google Books project makes it possible to search books for "identifying information instantaneously supplied [that] would otherwise not be obtainable in lifetimes of searching." *Id.* at 209.   With this broad purpose in mind, the court rightfully observed that this system "augments public knowledge." *Id.* at 207.   This rationale bears no comparison to Digs.

Nor is the limited transformation present on Digs remotely comparable to the unprecedented text mining, word pattern, frequency of use, and other statistical analyses made possible for the first time by Google Books.  Google Books search results provide "[a] brief description of each book, entitled 'About the Book,'" as well as, for some books, links for borrowing or purchasing the book.   *Id.* at 209. Significantly, a Google Books search produces only a "snippet" of the book, and sometimes it "disables snippet view entirely." *Id.* at 210.  At the request of a rights holder, Google "will exclude any book altogether from snippet view." *Id.*

These features, in conjunction with other creative aspects of Google Books, result in a categorically more transformative use than Zillow's simple tagging and query system that displays full-size copyrighted images serving the same purpose as the originals, with no option to opt out of the display, and with few, if any, transformative qualities. Any transformation by Zillow pales in comparison to the uses upheld in prior search engine cases.  Such use also does nothing to further the use of copyrighted works for the socially valuable purposes identified in the Copyright Act itself, like "criticism, comment, news reporting, teaching . . . , scholarship, or research."   17 U.S.C. § 107; *see also* 4 NIMMER ON COPYRIGHT § 13.05[A].  The lack of transformation is especially significant because, as *Kelly*

teaches, "[t]he more transformative the new work, the less important the other factors, including commercialism, become." 336 F.3d at 818 (citing *Campbell*, 510 U.S. at 579). If, as the Second Circuit suggested, Google's use "tests the boundaries of fair use," Zillow's efforts push Digs into the outer space of fair use. *Authors Guild*, 804 F.3d at 206. So while Google Books may inch across the boundary of fair use, Zillow's use does not approach the line.

Our decisions in *Amazon* and *Kelly* provide a roadmap for analyzing the second factor, which focuses on the nature of the copyrighted work. In those cases, we held that photographers' images are creative, especially when they are created for public viewing. *Amazon*, 508 F.3d at 1167; *Kelly*, 336 F.3d at 820. "Works that are creative in nature are 'closer to the core of intended copyright protection' than are more fact-based works." *Napster*, 239 F.3d at 1016 (quoting *Campbell*, 510 U.S. at 586).

So too here. VHT's photos are aesthetically and creatively shot and edited by professional photographers. That Zillow's curators select the most creative photos for the Digs searchable set underscores the creative nature of the works. But, as the district court properly noted, this factor operates "with less force" in favor of VHT because the photos had already been published on the Listing Platform. *See Kelly*, 336 F.3d at 820 ("The fact that a work is published or unpublished also is a critical element of its nature. Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred."). Ultimately, this factor only slightly favors VHT, further cutting against finding fair use.

The third factor evaluates the amount and substantiality of the copyrighted work that was used. "[C]opying an entire

work militates against a finding of fair use." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (quotation and citation omitted). However, this analysis is informed by the "purpose of the copying." *Campbell*, 510 U.S. at 586. In that spirit, we have found that copying full works qualifies as fair use where "[i]t was necessary . . . to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site." *Kelly*, 336 F.2d at 821. In contrast to *Amazon* and *Kelly*, nothing justifies Zillow's full copy display of VHT's photos on Digs.

Finally, the fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). To defeat a fair use defense, "one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Harper & Row Publishers*, 471 U.S. at 568 (citation and quotation omitted).

Although VHT had licensed only a handful of photos for secondary uses (and none on a searchable database), that market was more than "hypothetical." *See Amazon*, 508 F.3d at 1168. Significantly, VHT was "actively exploring" the market for licensing its photos to home design websites like Digs—including with Zillow itself. This factor favors VHT.

Taken together, the nature of Zillow's use, when integrated with the four factors, cuts against finding fair use by Zillow. We affirm the district court's grant of summary judgment to VHT with respect to fair use.

## II. Secondary Infringement—Digs

Turning to VHT's claim for secondary infringement, the district court correctly concluded that Zillow did not secondarily infringe VHT's exclusive rights in the 28,125 photos used on Digs, aside from 114 images created on Digs after VHT specifically identified them, which are not on appeal. As noted before with regard to the district court's ruling on direct infringement, "we apply the same standard used by the district court in evaluating the jury's verdict" and uphold the verdict unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Wallace*, 479 F.3d at 624; Fed. R. Civ. P. 50(a). The jury's verdict here did not meet this standard. We affirm the district court's grant of Zillow's motion for judgment notwithstanding the verdict with respect to secondary infringement, both contributory and vicarious infringement.

### A. Contributory Liability

Contributory liability requires that a party "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). Zillow's actions do not satisfy the second prong—material contribution or inducement—so we do not address the first prong. *See Giganews*, 847 F.3d at 671.

In *Giganews*, we outlined the means of material contribution to infringement:

> In the online context, . . . a "computer system operator" is liable under a material contribution theory of infringement "if it has

*actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works."

*Id.* at 671 (quoting *Amazon*, 508 F.3d at 1172); *see also Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) (applying this standard in the online context); *Napster*, 239 F.3d at 1022 (same); *Religious Tech. Ctr. v. Netcom On-Line Comm'n Servs., Inc.*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) (same). There is insufficient evidence to support the contributory infringement verdict under the "simple measures" standard.

VHT's position that "the jury could have reasonably decided that Zillow in fact had the means to identify and remove" the allegedly infringing images that VHT identified by property address, as opposed to their website designation or Uniform Resource Locator ("URL"), fails. Zillow testified throughout trial that, in order to systematically or swiftly take down a large number of photos, it required the Zillow Image ID–a number that is in the URL for each image. This stands to reason, because "Zillow receives multiple copies of the same photograph, depicting the same property, with the same listing agent, from different feeds." Merely identifying the physical property address in no way identified the proper feed or the correct photo. Thus, Zillow did not have appropriately "specific" information necessary to take "simple measures" to remedy the violation.

VHT's argument that Zillow is liable for failing to ask for the URLs of the allegedly infringing photos also fails. Asking for the URLs was not Zillow's duty under the contributory liability standard: Zillow must have "*actual*

knowledge that *specific* infringing material is available using its system." *Amazon*, 508 F.3d at 1172 (citation and quotation omitted). Zillow first reasonably asked to see the licenses between VHT and the feed providers; otherwise, Zillow could not assess ownership and rights in the undefined images. That Zillow did not proactively request a list of URLs before VHT filed suit does not make Zillow contributorily liable.

Additionally, Zillow's failure to systematically use watermarking technology does not show there was a "simple measure" available that it failed to use. Even assuming there were "reasonable and feasible means" for Zillow to employ watermark detection technology, in practice VHT rarely watermarked its photos. *See Giganews*, 847 F.3d at 672 (citation and quotation omitted).

Nor did Zillow induce infringement. Inducement liability requires evidence of "active steps . . . taken to encourage direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (citation and quotation omitted)). Evidence of active steps includes "advertising an infringing use or instructing how to engage in an infringing use," because such evidence "show[s] an affirmative intent that the product be used to infringe." *Id.*; *see also Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013) (inducement liability requires "an object of promoting [the product's] use to infringe copyright"). The "improper object" of infringement "must be plain and must be affirmatively communicated through words or actions[.]" *Fung*, 710 F.3d at 1034.

In view of the evidence, "no reasonable juror could conclude [Zillow] distributed its product with the object of

promoting its use to infringe copyright." *Giganews*, 847 F.3d at 672 (quotation and citation omitted). For example, Zillow's generally applicable tools and messages for users to save more photos from the Listing Platform to Digs does not "promote[] the use of [Digs] specifically to infringe copyrights." *Amazon*, 508 F.3d at 1170 n.11. Nor does evidence that Zillow sometimes makes mistakes about the display rights in a feed plainly communicate an improper object of infringement. Zillow corrects these inadvertent errors when it learns of them. Because a "failure to take affirmative steps to prevent infringement" alone cannot trigger inducement liability, the inducement claim is a particularly poor fit for Zillow's real estate and home design websites, which have "substantial noninfringing uses." *Grokster*, 545 U.S. at 939 n.12.

## B. Vicarious Liability

Neither does the vicarious liability theory fit the Zillow platform. To prevail on a vicarious liability claim, "[VHT] must prove '[Zillow] has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'" *Giganews*, 847 F.3d at 673 (quoting *Visa*, 494 F.3d at 802). The first element requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Amazon*, 508 F.3d at 1173. VHT's vicarious infringement argument fails because, as the district court found, "Zillow 'lack[ed] the practical ability to police' its users' infringing conduct" on Digs.

As discussed with respect to contributory infringement, there was insufficient evidence that Zillow had the technical ability to screen out or identify infringing VHT photos among the many photos that users saved or uploaded daily

to Digs. Regardless, such allegations do not fall under the vicarious liability rubric: Zillow's "failure to change its operations to avoid assisting [users] to distribute . . . infringing content . . . is not the same as declining to exercise a right and ability to make [third parties] stop their direct infringement." *Amazon*, 508 F.3d at 1175.

Our conclusion is consistent with earlier dicta that "the vicarious liability standard applied in *Napster* can be met by merely having the general ability to locate infringing material *and terminate users' access*." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013) (emphasis added). Once VHT photos were uploaded to the Listing Platform with appropriate certification of rights, ferreting out claimed infringement through use on Digs was beyond hunting for a needle in a haystack. As the district court concluded, "the trial record lacks substantial evidence of a practical ability to limit direct infringement for the same reasons it lacks substantial evidence of simple measures to remove infringing material." And linking a claimed infringement to a feed provider was even more of an impossibility.

We affirm the district court's judgment notwithstanding the verdict concluding that substantial evidence did not support the claim that Zillow secondarily infringed VHT's exclusive rights in its photos.

## III. Damages

### A. Compilation

The size of the damages award hinges on whether VHT's photos used on Digs are part of a "compilation" or if they are individual photos. This distinction makes a difference. If the VHT photo database is a "compilation," and therefore

one "work" for the purposes of the Copyright Act, then VHT would be limited to a single award of statutory damages for Zillow's use of thousands of photos on Digs.  17 U.S.C. § 504(c)(1).  But if the database is not a compilation, then VHT could seek damages for each photo that Zillow used.

In lieu of actual damages, a copyright holder may elect to receive statutory damages under the Copyright Act.  17 U.S.C. § 504(c)(1).  VHT did so.  The Act provides for "an award of statutory damages for all infringements involved in the action, with respect to any one work . . . in a sum of not less than $750 or more than $30,000."  *Id.*  This provision ties statutory damages to the term "work," which is undefined, except in a circular manner: copyright law protects "original works of authorship."  17 U.S.C. § 102(a).  Fortunately, there is a definition of compilation: "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.  For purposes of statutory damages, "all the parts of a compilation     . . . constitute one work."  17 U.S.C. § 504(c)(1).  "The question of whether a work constitutes a 'compilation' for the purposes of statutory damages pursuant to Section 504(c)(1) of the Copyright Act is a mixed question of law and fact."  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010).

Whether various VHT photo collections comprise one or more compilations is a threshold damages question.  Before trial, Zillow asked for a legal determination on the compilation issue.  That motion was denied.  However, the district court did not make an explicit determination about compilation and the specifics of compilation were not put before the jury.  In fairness to the district court, we might

infer from the transcript that there was an implicit determination as to whether VHT's photos are part of a compilation, but we are left in doubt. Instead, the jury was instructed that "[e]ach VHT Photo that has independent economic value constitutes a separate work." On the verdict form, the jury was asked which "photographs have independent economic value."

The notion of "independent economic value" derives not from the statute, but from case law. In the Ninth Circuit, the question of whether something—like a photo, television episode, or so forth—has "independent economic value" informs our analysis of whether the photo or episode is a work, though it is not a dispositive factor. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193 (9th Cir. 2001). But consideration of the independent economic value factor does not answer the question whether something is a compilation. That question remains unanswered here.

On appeal, the parties have polar opposite views on whether there was a compilation (Zillow's position) or whether each photo is entitled to a separate damages award (VHT's position). VHT registered thousands of photos as compilations. But the Copyright Office warns that such a registration "may" limit the copyright holder "to claim only one award of statutory damages in an infringement action, even if the defendant infringed all of the component works covered by the registration." U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1104.5 (Sept. 2017), https://www.copyright.gov/comp3/ docs/compendium.pdf. Though the registration label is not controlling, it may be considered by the court when assessing whether a work is a compilation. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1277

(11th Cir. 2015) ("Although the manner of copyright registration is not dispositive of the works issue, this Court has previously considered it to be at least a relevant factor."). Ultimately, what counts is the statutory definition.

Because there were at least ten different copyright registrations, thousands of photos, and no explicit determination on compilation, we decline to sort out the compilation issue on appeal. We remand to the district court for further proceedings as to whether the VHT photos remaining at issue were a compilation.

## B. Willfulness

The jury found that Zillow willfully infringed exclusive rights to 3,373 searchable VHT photos that were eligible for statutory damages. The district court largely upheld the willfulness finding in its post-trial motions order. However, the court granted Zillow judgment notwithstanding the verdict on 673 images that were not displayed, so the court's final willfulness judgment applied to 2,700 searchable photos on Digs.

To uphold a jury's willfulness finding, there must be substantial evidence "(1) that the [the infringing party] was actually aware of the infringing activity, or (2) that the [infringing party's] actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Unicolors*, 853 F.3d at 991 (citation and quotation omitted). Under the second prong, willful blindness requires that the infringing party "(1) subjectively believed that infringement was likely occurring on their networks and that they (2) took deliberate actions to avoid learning about the infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013). Reckless disregard can be demonstrated, for example, when a party "refus[es], as a

matter of policy, to even investigate or attempt to determine whether particular [photos] are subject to copyright protections." *Unicolors*, 853 F.3d at 992.  A finding of willfulness has significant financial consequences—the jury may increase damages up to $150,000 per violation.  *See* 17 U.S.C. § 504(c)(2).

As noted with respect to infringement, we do not take lightly the decision to reverse a jury verdict, nor do we cavalierly set aside the district court's thoughtful analysis. But here, we are compelled to disagree with both because substantial evidence does not support willfulness as to the 2,700 photos.

The test for willfulness is in the alternative: *either* actual notice *or* recklessness shown by reckless disregard or turning a blind eye to infringement.  We turn first to actual notice.  That VHT provided Zillow with minimal notice of infringement does not itself establish that any subsequent infringement was willful.  Rather, "[c]ontinued use of a work even after one has been notified of his or her alleged infringement does not constitute willfulness so long as one believes reasonably, and in good faith, that he or she is not infringing." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012); *see also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) ("It would seem to follow that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes.") (quoting 4 NIMMER ON COPYRIGHT § 14.04[B][3]).

Such is the case here.  Zillow's agreements with its feed providers grant it an express license to use, copy, distribute, publicly display, and create derivative works for each photo,

and the agreements include unambiguous representations by the feed providers that they have the authority to assign such rights. Zillow developed procedures to identify ex ante the scope of its license for each uploaded photo and employed automated protocols to manage the use of each photo consistent with its evergreen or deciduous designation. At no point during their year of communications prior to issuance of the notice letter did VHT raise the specter of infringement. Notably, VHT's eventual notice was minimal: one letter with a list of allegedly infringing photos, designated by residential street address, not web address.

The notion that Zillow failed to take appropriate responsive measures after receiving this notice is belied by the record. Zillow immediately requested information to confirm VHT's copyright ownership and cross-reference the photos with licensing information. VHT was not forthcoming with that information. Rather, in response, VHT offered merely an unsigned form contract. Instead of providing helpful information, VHT then filed suit. Given the limited information provided by VHT, Zillow could not reasonably be expected to have promptly and unilaterally removed each flagged photo. As the district court noted, VHT failed to demonstrate there were simple measures available for the removal of infringing photos or that Zillow had any "practical ability to independently identify infringing images."

Thus, we are compelled to conclude that substantial evidence does not show Zillow was "actually aware" of its infringing activity. *See Evergreen Safety Council*, 697 F.3d at 1228. Zillow's belief that feed providers had properly licensed its uses and that its system effectively respected those rights was reasonable. And, as the district court observed, "[t]he record suggests no reason to conclude that

Zillow maintained that position in bad faith, and Zillow's non-infringement contention proved accurate as to most of the images at issue in this lawsuit."

We reach the same conclusion as to whether Zillow recklessly disregarded or willfully blinded itself to its infringement. In reaching an opposite conclusion, the district court observed that Zillow did not "perform[] further investigation into the rights each [feed provider] possesses," nor did it "t[ake] responsive measures to obtain further information" after VHT provided the minimal notice of potential infringement. That conclusion is at odds with the evidence, for the reasons outlined above.

VHT's argument that Zillow, a sophisticated business with a robust legal team, should have known that its feed provider license agreements were invalid is unavailing. VHT argues that when Zillow saw the non-exclusive grant of rights in VHT's unsigned form contract, showing that the feed providers did not have a right to sublicense, Zillow should have known the licenses were invalid. Despite requests for such information, Zillow did not have access to VHT's executed licenses with the feed providers who furnished VHT's photos to Zillow. Access to a blank form contract (that the district court earlier found ambiguous as a matter of law) is not enough. We conclude that substantial evidence does not show Zillow was "reckless or willfully blind" as to its infringement. We reverse the district court and vacate the jury's finding of willful infringement.

## IV. Conclusion

We affirm the district court's summary judgment in favor of Zillow on direct infringement of the Listing Platform photos. With respect to direct liability on the Digs photos, we affirm the district court's grant of judgment

notwithstanding the verdict on the 22,109 non-displayed photos and the 2,093 displayed but not searchable photos. We uphold summary judgment in favor of VHT on the 3,921 displayed, searchable photos.

We affirm the district court's judgment notwithstanding the verdict on secondary liability, both contributory and vicarious, on the Digs photos.

We reverse the district court's denial of judgment notwithstanding the verdict on the issue of willfulness and vacate the jury's finding on willfulness.

We remand consideration of the compilation issue to the district court.

**Affirmed in part, reversed in part and remanded. Each party shall pay its own costs on appeal.**