**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

REARDEN, LLC; REARDEN MOVA, LLC,

*Plaintiffs - Appellants*,

v.

WALT DISNEY PICTURES, a California corporation,

*Defendant - Appellee*.

No. 24-3970

D.C. No. 4:17-cv-04006-JST

OPINION

Appeal from the United States District Court for the Northern District of California Jon S. Tigar, District Judge, Presiding

Argued and Submitted June 4, 2025 San Francisco, California

Filed September 11, 2025

Before: Consuelo M. Callahan, Bridget S. Bade, and Lucy H. Koh, Circuit Judges.

Opinion by Judge Koh

# SUMMARY[*]

## Copyright

The panel affirmed in part and reversed in part the district court's judgment as a matter of law in favor of Defendant Walt Disney Pictures ("Disney") after a two-week jury trial involving a claim of vicarious copyright infringement brought by Plaintiffs Rearden, LLC and Rearden MOVA, LLC (collectively, "Rearden"). Rearden alleged that one of Disney's visual effects contractors, Digital Domain 3.0 ("DD3"), made unauthorized copies of Rearden's copyrighted facial motion capture software during the production of Disney's 2017 film *Beauty and the Beast*. The jury found Disney vicariously liable for copyright infringement, awarded Rearden actual damages, and returned an advisory verdict on the issue of disgorgement of profits. Post-trial, the district court granted Disney judgment as a matter of law, concluding that Rearden had failed to introduce sufficient evidence at trial of Disney's practical ability to stop or limit the directly infringing conduct.

The panel reversed the district court's grant of judgment as a matter of law in favor of Disney, concluding that Rearden had introduced legally sufficient evidence at trial for a jury to conclude that Disney had the practical ability to stop or limit DD3's infringing conduct.

The panel affirmed the district court's ruling striking Rearden's jury demand on the issue of disgorgement of profits, holding that the Copyright Act provides no statutory

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

jury trial right on the disgorgement of profits remedy. The panel also concluded that the district court committed no reversible procedural error by striking Rearden's jury demand mid-trial.

The panel also affirmed two of the district court's pretrial evidentiary rulings, concluding that the district court did not abuse its discretion in excluding portions of the testimony of Rearden's damages expert or in excluding evidence of an indemnification agreement between DD3 and Disney.

## COUNSEL

Mark Carlson (argued), Steve W. Berman, Garth Wojtanowicz, and Jerrod C. Patterson, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; Rio Pierce, Hagens Berman Sobol Shapiro LLP, Berkeley, California; for Plaintiffs-Appellees.

Kelly M. Klaus (argued), Stephanie G. Herrera, Blanca F. Young, and Shannon G. Aminirad, Munger Tolles & Olson LLP, San Francisco, California; John W. Spiegel, Anne Conley, and Rowley J. Rice, Munger Tolles & Olson LLP, Los Angeles, California; for Defendant-Appellee.

**OPINION**

KOH, Circuit Judge:

This appeal arises from a claim of vicarious copyright infringement brought by Plaintiffs-Appellants Rearden, LLC and Rearden MOVA, LLC (collectively, "Rearden") against Defendant-Appellee Walt Disney Pictures ("Disney"). Rearden alleges that one of Disney's visual effects contractors, Digital Domain 3.0 ("DD3"), made unauthorized copies of Rearden's copyrighted MOVA Contour Reality Capture software ("MOVA") during the production of Disney's 2017 live-action *Beauty and the Beast* film. After a two-week trial, a jury found Disney liable for vicarious copyright infringement, awarded Rearden $250,638 in actual damages, and returned an advisory verdict that Disney's profits attributable to infringement amounted to $345,098. The district court initially adopted the advisory verdict but later granted Disney's motion for judgment as a matter of law ("JMOL"), concluding that Rearden had failed to introduce legally sufficient evidence at trial that Disney had the practical ability to supervise DD3's directly infringing conduct.

On appeal, Rearden argues that the district court erred in granting Disney's motion for JMOL and that it is entitled to a new jury trial on the issue of apportionment of profits. For the reasons below, we affirm in part, reverse in part, and remand.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

#### i. The MOVA Copyright

MOVA Contour Reality Capture is a facial motion capture system used to record acting performances and translate facial motion into digital files used to animate the faces of computer graphics ("CG") film characters. The MOVA system is made up of physical components (including an array of cameras, lights, and facial makeup) as well as a software program that directs the operation of the physical components and processes the captured camera data. The MOVA software program is the copyrighted work at issue in this appeal.

Rearden, LLC, a technology incubator founded by Steve Perlman, began developing MOVA in 2000 and first publicized the technology at a trade show in 2006. Between 2006 and 2012, MOVA technology was used in 17 films, including Disney's *TRON: Legacy*, *Pirates of the Caribbean: On Stranger Tides*, *John Carter*, and *The Avengers*. Over time, Rearden secured various intellectual property protections for its MOVA technology, including a copyright on the MOVA software registered in February 2016.

Between 2007 and 2013, the MOVA assets were transferred to various Rearden-affiliated companies.[1] Of most relevance to this appeal, in February 2013, at the urging

---

[1] The full ownership history of the MOVA assets is provided in *Shenzhenshi Haitiecheng Science & Technology Co. v. Rearden LLC*, No. 15-CV-00797, 2017 WL 3446585, at *1-8 (N.D. Cal. Aug. 11, 2017), *aff'd*, 823 F. App'x 455 (9th Cir. 2020).

of Perlman, the MOVA assets were transferred to a newly organized company called MO2, LLC ("MO2"). MO2 was organized and managed by a former Rearden employee, Gregory LaSalle, who had operated the MOVA system on previous studio projects. Shortly thereafter, against Perlman's wishes, LaSalle surreptitiously organized a sale of the MOVA assets from MO2 to a DD3 affiliate, Shenzhenshi Haitiecheng Science & Technology Co. ("SHST"). LaSalle then joined DD3 and continued operating the MOVA system.

In May 2013, Perlman attempted to contact DD3 about the MOVA assets, but DD3 denied having them. However, in 2014, Perlman became aware that MOVA technology was being considered for the Academy of Motion Pictures Arts and Sciences' ("Academy") Technical Achievement Award. Perlman was contacted by a member of the award committee for an interview, during which he was asked about the use of MOVA on Disney's *Guardian of the Galaxy* film. Perlman had not known that MOVA had been used on the film and later investigated the film credits, which stated: "Facial capture by MOVA, a division of Digital Domain 3.0."

MOVA eventually received the Technical Achievement Award, and the Academy named as awardees the four people who it felt contributed most to MOVA's development, including LaSalle. Perlman filed an appeal with the Academy regarding the proper attribution of the award. Perlman argued that he and another team member should have been named as awardees instead of LaSalle because they had contributed significantly more to MOVA's development. On February 6, 2015, *The Hollywood Reporter* published an article about the appeal, in which Perlman explicitly stated that he had never licensed DD3 to use the MOVA technology.

A few weeks later, on February 20, 2015, SHST sued Rearden, seeking a declaration that it owned the MOVA assets. Complaint, *Shenzhenshi Haitiecheng*, No. 15-CV-00797, Dkt No. 1. Rearden countersued, seeking a declaration that it owned the MOVA assets. Answer and Counterclaims, *Shenzhenshi Haitiecheng*, No. 15-CV-00797, Dkt No. 21.

In August 2017, after a bench trial, the district court issued its decision. *Shenzhenshi Haitiecheng*, 2017 WL 3446585 (N.D. Cal. Aug. 11, 2017). Ultimately, the district court determined that MO2's sale of the MOVA assets to SHST was ineffective because LaSalle had been an employee of Rearden when MO2 acquired the assets. *See id.* at *8. Because of LaSalle's employment agreement with Rearden, the MOVA assets had transferred to Rearden, and LaSalle was therefore not authorized to conduct the sale to SHST on MO2's behalf. *Id.* at *8-9. Accordingly, the court determined that DD3 never had the right to use MOVA and ordered DD3 to return all MOVA assets to Rearden. *Id.* at *9-10.

### ii.  The *Beauty and the Beast* Production

While the MOVA ownership dispute was being litigated, DD3 continued to use MOVA technology on various studio projects. In March 2015, Disney engaged DD3 as a vendor for visual effects work on Disney's live-action remake of the 1991 animated film *Beauty and the Beast* ("*BATB*").

Disney's contract with DD3 gave Disney broad control over DD3's work product and process. Among other things, Disney was entitled to weekly progress reports, had the right to review all works in progress and request changes, and retained all approvals and controls. The contract also granted Disney the right to terminate the contract in the event of

copyright infringement. DD3 agreed to indemnify Disney for any breach of DD3's representations and warranties, which included a warranty that its work would not infringe any copyrights.

Principal photography for *BATB* occurred from May to August 2015. Filming involved nine MOVA facial capture sessions, the final of which was a reshoot that took place in June 2016. Contractor Steve Gaub, designated as Disney's "Picture Representative" in the DD3 contract, attended all MOVA facial capture sessions and reviewed MOVA software output. Bill Condon, hired by Disney as the film's director, also attended all MOVA sessions to direct the actors and was part of the team that reviewed MOVA output and selected shots for further processing.

During the MOVA facial capture sessions, DD3 employees operated the physical system and the MOVA software, which processed captured camera data into digital files. These files were then rendered on computers present on-set, allowing live review by the director and others. At trial, Rearden presented evidence showing a copyright notice reading "Copyright 2016 – Rearden LLC" appeared on these on-set computers each time a new data file was loaded into the on-set file player.

*BATB* was released on March 17, 2017, and ultimately earned approximately $215 to $225 million in profits.

## B.    Procedural History

In July 2017, Rearden filed suit against Disney alleging, as relevant here, vicarious and contributory copyright infringement. Rearden's theory of direct infringement was that each time DD3 used MOVA to capture a four-second shot on *BATB*, its computers made an unauthorized copy of

the MOVA software program. Rearden alleged that Disney was vicariously liable for DD3's infringing conduct because Disney had contracted with DD3 to provide facial capture services using MOVA to create CG characters for *BATB*. Rearden also alleged that Disney was contributorily liable for DD3's infringing conduct because Disney had actual knowledge of DD3's infringement and induced, caused, and materially contributed to the infringement.

In July 2023, after the close of fact discovery, Disney filed a motion for summary judgment. The district court granted summary judgment to Disney on the contributory infringement claim, concluding that Rearden lacked evidence that Disney had actual or constructive knowledge of DD3's infringement. The district court explained that the resolution of the MOVA ownership dispute occurred nearly five months after *BATB* was released in theaters and that, as a nonparty to that litigation, Disney "was not adequately positioned to ascertain the veracity of Rearden's ownership claim" and thus lacked knowledge of the direct infringement. However, the district court denied summary judgment to Disney on the vicarious infringement claim for two reasons. First, the district court noted that "the contract between DD3 and Disney secures for Disney considerable control over DD3's services such that it is possible that Disney could have, as a practical matter, taken affirmative steps to stop or limit DD3's use of MOVA." Second, the district court explained that the involvement of Disney representatives in the selection of DD3 as a vendor and in the facial motion capture process "creates a genuine dispute of material fact as to whether Disney could have limited or stopped DD3's use of MOVA during the production process." Additionally, having previously granted Disney's motion to exclude the testimony of Rearden's actual

damages expert, the district court granted Disney's motion for summary judgment on Rearden's claim for actual damages.

As the parties prepared for trial on the vicarious liability claim, the district court made several pretrial evidentiary rulings relevant to this appeal. First, the district court granted Disney's motion to exclude portions of the testimony of Rearden's damages expert regarding apportionment of profits under Federal Rule of Evidence 702. Second, the district court granted Disney's motion in limine to exclude evidence that Disney's contract with DD3 included an indemnification provision under which DD3 agreed to indemnify Disney for liability arising from, among other things, copyright infringement under Federal Rule of Evidence 403.

As trial approached, the court also considered which questions concerning damages would be submitted to the jury. Initially, Disney had consented to try all damages questions, including actual damages and apportionment of profits, to a jury. However, after the court granted summary judgment to Disney as to Rearden's actual damages claim, Disney argued for the first time that Rearden lacked the right to a jury trial on the issue of disgorgement of profits. Several weeks before trial, Disney filed a motion to strike the jury demand, arguing that neither the Copyright Act nor the Seventh Amendment created the right to a jury trial. Rearden opposed the motion on its merits and, in the alternative, requested an advisory jury. Shortly before trial, on November 29, 2023, the district court granted Rearden's motion to reconsider its grant of summary judgment to Disney on the actual damages claim and allowed Rearden to proceed to trial on that claim. As part of this ruling, the

district court denied Disney's motion to strike Rearden's jury demand "as moot."

On December 6, 2023, the case proceeded to a jury trial on Rearden's sole remaining claim of vicarious copyright infringement. Mid-trial, on December 14, 2023, the district court announced *sua sponte* that it had erred in denying as moot the motion to strike the jury demand as to disgorgement of profits. At this point in the trial, Rearden had presented nearly all of its case-in-chief but had not yet called its damages expert. The same day, the district court issued a written decision granting Disney's motion to strike the jury demand on Rearden's claim for disgorgement of profits. *Rearden LLC v. Walt Disney Co.*, No. 17-CV-04006, 2023 WL 9187385 (N.D. Cal. Dec. 14, 2023). The district court concluded that "[n]either the language of 17 U.S.C. § 504(b) nor the Seventh Amendment to the U.S. Constitution give Rearden the right to a jury on this claim." *Id.* at *1. The district court granted Rearden's alternative request to empanel an advisory jury on this claim under Federal Rule of Civil Procedure 39(c). *Id.* at *2.

After a two-week trial, the jury returned a verdict that Disney was vicariously liable for DD3's infringement of the MOVA copyright. The jury awarded Rearden $250,638 in actual damages and returned an advisory verdict that Disney's profits attributable to infringement amounted to $345,098. The district court adopted the advisory verdict and entered judgment in favor of Rearden.

However, in August 2024, the district court granted Disney's motion for JMOL, concluding that Rearden failed to introduce legally sufficient evidence at trial that Disney had the practical ability to stop or limit DD3's infringing conduct. *Rearden LLC v. Walt Disney Co.*, No. 17-CV-

04006, 2024 WL 3956318 (N.D. Cal. Aug. 26, 2024) (hereinafter the "*JMOL Order*"). As summarized by the district court, "Disney's position rests on the argument that in order for a defendant to have the practical ability to limit or stop infringing conduct, it must have the practical ability to observe the conduct and recognize when that conduct is infringing. In other words, in order to control infringing conduct, one must be able to *identify* the infringing conduct." *Id.* at *5. The district court explained that Disney's position was supported by three Ninth Circuit cases: *A&M Records, Inc. v. Napster, Inc.* ("*Napster*"), 239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001); *Perfect 10, Inc. v. Amazon.com, Inc.* ("*Amazon*"), 508 F.3d 1146 (9th Cir. 2007); and *VHT Inc. v. Zillow Group, Inc.*, 918 F.3d 723 (9th Cir. 2019). *Id.* at *5-6. Applying these cases, the district court concluded that "Rearden failed to introduce legally sufficient evidence at trial that Disney had the practical ability to identify, and therefore supervise or control, whether its vendors such as DD3 were infringing copyright." *Id.* at *7.

The district court subsequently entered judgment in favor of Disney, and shortly thereafter Rearden filed this appeal.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291. We review the district court's grant of JMOL de novo. *Gray v. Hudson*, 28 F.4th 87, 95 (9th Cir. 2022). The district court may grant JMOL if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). JMOL is appropriate only if "the evidence,

construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (citation omitted).

"Whether a party is entitled to a jury trial is a question of law that we review de novo." *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 39 F.4th 1113, 1118 (9th Cir. 2022). "We review a district court's decision to exclude expert testimony for abuse of discretion." *Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023) (citing *United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010)). We review a district court's evidentiary rulings under Federal Rule of Evidence 403 for abuse of discretion. *United States v. Sullivan*, 131 F.4th 776, 786 (9th Cir. 2025) (citing *United States v. Tsarnaev*, 595 U.S. 302, 322-23 (2022)).

## III.   VICARIOUS COPYRIGHT LIABILITY

To prevail on a claim of vicarious liability for copyright infringement, a plaintiff must establish that the defendant has "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *VHT*, 918 F.3d at 746 (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017)); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One . . . infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." (citation omitted)). We have explained that the first element, *i.e.*, the "control element," requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *VHT*, 918 F.3d at 746 (quoting *Amazon*, 508 F.3d at 1173).

The district court determined that Rearden failed to produce legally sufficient evidence at trial to support the jury's finding on the control element, specifically concluding that Rearden failed to establish "that Disney had the practical ability to identify, and therefore supervise or control, whether its vendors such as DD3 were infringing copyright." *JMOL Order*, at *7. This ruling was premised on Disney's argument "that in order for a defendant to have the practical ability to limit or stop infringing conduct, it must have the practical ability to observe the conduct and recognize when that conduct is infringing. In other words, in order to control infringing conduct, one must be able to *identify* the infringing conduct." *Id*. at *5. Although Disney's position is not without some support in our case law, we conclude that the district court erred in granting JMOL here.

We first considered the issue of vicarious liability for copyright infringement in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996). In *Fonovisa*, we held that a swap meet operator plausibly stated a claim for vicarious liability based on vendors' sale of counterfeit records. *Id.* at 262-64. However, we did not explicitly consider the defendant's ability to identify the vendors' direct infringement, as "[t]here [was] no dispute for purposes of th[e] appeal that [the defendants] were aware that vendors in their swap meet were selling counterfeit recordings." *Id.* at 261.

We first had occasion to address whether a defendant must have the ability to identify direct copyright infringement to be held vicariously liable several years later in *Napster*. In *Napster*, plaintiff copyright owners brought claims of vicarious copyright infringement against Napster, the operator of a peer-to-peer music-file sharing platform. 239 F.3d at 1011. Napster's file-sharing service allowed

registered users to make MP3 music files stored on individual hard drives available for copying by other Napster users. *Id.* We affirmed the district court's grant of a preliminary injunction, concluding in relevant part that the plaintiffs had demonstrated that they would likely succeed in establishing that Napster had the right and ability to supervise its users' conduct. *Id.* at 1023-24. We explained that the control element was likely met because Napster "ha[d] the ability to locate infringing material listed on its search indices, and the right to terminate users' access to the system." *Id.* at 1024.

However, we ordered the district court to narrow the scope of the preliminary injunction because we concluded that the court had "failed to recognize that the boundaries of the premises that Napster 'controls and patrols' are limited." *Id.* at 1023. Because "the Napster system does not 'read' the content of indexed files, other than to check that they are in the proper MP3 format," *id.* at 1024, we instructed the district court to,"[i]n crafting the injunction on remand, . . . recognize that Napster's system does not currently appear to allow Napster access to users' MP3 files," *id.* at 1027. In short, we determined that Napster could be held vicariously liable for copyright infringement, but only for infringement that it could reasonably identify and remove from the Napster platform.

In several subsequent cases involving defendants operating technological platforms, we similarly limited the scope of vicarious liability to infringement that the defendants could reasonably identify and remove. In *Amazon*, we considered a copyright claim brought against Google that alleged Google was vicariously liable for its practice of providing links to infringing full-size images on third party websites. 508 F.3d at 1154. Reviewing the denial

of a preliminary injunction, we agreed with the district court's conclusion that the plaintiff was unlikely to prevail on its vicarious liability claim. *Id.* at 1173-75. The district court had found that Google's supervisory power over third party websites was limited because "Google's software lacks the ability to analyze every image on the [I]nternet, compare each image to all the other copyrighted images that exist in the world . . . and determine whether a certain image on the web infringes someone's copyright," and because the technological measures Google could implement to block access to infringing images were "not workable." *Id.* at 1174 (alteration in original) (quoting *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 858 (C.D. Cal. 2006)). We held that these findings were "not clearly erroneous," explaining that "[w]ithout image-recognition technology, Google lacks the practical ability to police the infringing activities of third-party websites." *Id.* This, we explained, was what "distinguishes Google from the defendants held liable in *Napster* and *Fonovisa*. . . . Napster had the ability to identify and police infringing conduct by searching its index for song titles. . . . . [The] swap meet operator [in *Fonovisa*] had the ability to identify and police infringing activity by patrolling its premises." *Id.* (citations omitted).

Similarly, in *VHT*, we affirmed the district court's grant of judgment notwithstanding the verdict to Zillow, the operator of an online real estate marketplace, on a claim of vicarious liability brought by VHT, a real estate photography studio. 918 F.3d at 730, 746. VHT alleged that Zillow was vicariously liable for the copyright infringement of brokers, agents, and listing services who uploaded photos to Zillow's platform in violation of their licensing agreements with VHT. *Id.* at 730. We concluded that "there was insufficient evidence that Zillow had the technical ability to screen out

or identify infringing VHT photos among the many photos that users saved or uploaded daily," and that "[o]nce VHT photos were uploaded to [Zillow's platform] with appropriate certification of rights, ferreting out claimed infringement . . . was beyond hunting for a needle in a haystack." *Id.* at 746.

In our view, this case is more similar to *Napster* and *Fonovisa* than it is to *Amazon* or *VHT*. Construing the evidence in the light most favorable to Rearden, *see White*, 312 F.3d at 1010, there was a legally sufficient evidentiary basis for the jury to find that Disney had the practical ability to supervise and control DD3's infringing conduct.

On appeal, Rearden argues that it was legal error for the district court to impose an "ability to identify" infringement requirement to its claim of vicarious liability. We need not and do not resolve the legal question of whether vicarious liability always requires proof that the defendant has the practical ability to "identify" or "recognize" specific conduct as infringing. Even assuming *arguendo* that such a showing is required, we conclude that Disney is not entitled to JMOL in this case. We note, however, that actual knowledge is not an element of vicarious copyright infringement. *See, e.g.*, *Grokster*, 545 U.S. at 930 n.9 ("[V]icarious liability . . . allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, *even if the defendant initially lacks knowledge of the infringement*." (emphasis added)). To be sure, there is a difference between actual knowledge of direct infringement and an opportunity to identify direct infringement. But "[t]he concept of vicarious copyright liability was developed in the Second Circuit as an outgrowth of the agency principles of respondeat superior." *Fonovisa*, 76 F.3d at 261-62 (citing *Shapiro, Bernstein &*

*Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)). A narrow focus on the defendant's ability to identify specific acts of infringement is in some tension with the historical roots of vicarious liability, as respondeat superior liability is premised on the relationship between the defendant and the tortfeasor, rather than the relationship between the defendant and the tort. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013) ("[T]o the degree [the Digital Millenium Copyright Act's safe harbor provision] had its origin in vicarious liability concepts, those concepts rest on the overall relationship between the defendant and the infringers, rather than on specific instances of infringement." (internal citations omitted)); *Rams v. Def Jam Recordings, Inc.*, 202 F. Supp. 3d 376, 384 (S.D.N.Y. 2016) ("Unlike contributory liability, vicarious liability rests not on the defendant's relationship to the direct infringement but rather on the defendant's relationship to the direct infringer." (citation omitted)).

Disney argues that it lacked the practical ability to identify DD3's infringement for two reasons. First, Disney argues that it is impractical to require studios to conduct due diligence on every piece of software used by vendors on large-scale productions, such as *BATB*, and that it had no specific reason to question DD3's authorization to use MOVA here. Second, Disney argues that even if it had conducted due diligence to confirm DD3's authorization to use MOVA, it would have had no way to recognize that DD3's use of the software was infringing. Based on the evidence presented at trial, however, the jury could have reasonably rejected these arguments and concluded that Disney had the practical ability to identify DD3's use of MOVA as potentially infringing.

## A.    Practical Ability to Supervise DD3

Disney first argues that it is entitled to JMOL on the control element because it had no practical ability to supervise all its *BATB* vendors and no specific reason to investigate DD3's authorization to use MOVA. We disagree.

Uncontroverted evidence introduced at trial showed that at least two Disney representatives—director Bill Condon and visual effects supervisor Steve Gaub—were physically present and actively participated in all MOVA capture sessions. From this evidence, the jury could reasonably conclude that DD3's infringing use of MOVA was within the "premises that [Disney] controlled and patrolled." *Fonovisa*, 76 F.3d at 262. And Disney's contract with DD3 clearly gave it all necessary legal rights to supervise and control DD3's use of MOVA. Gaub, along with other Disney representatives, had the contractual rights to require DD3 to turn over all work product upon request and the right to terminate the contract for copyright infringement.

Despite this actual supervision and these broad contractual rights, Disney argues that it had no reason to believe the use of MOVA was infringing and that, in the absence of such a reason, identifying DD3's direct infringement was "beyond hunting for a needle in a haystack." *VHT*, 918 F.3d at 746. To be sure, it was undisputed at trial that DD3 represented to Disney that it had all necessary rights to use the technology on the film and that its services would not infringe any copyrights. It was also undisputed that Rearden did not inform Disney that Rearden believed DD3's use of MOVA was infringing until after *BATB* had been released. However, the defendant, not the copyright owner, bears the burden of affirmatively "guard[ing] against the infringement." *Shapiro*, 316 F.2d at

308. "Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability." *Napster*, 239 F.3d at 1023.

The jury could have reasonably concluded that, even in the absence of a specific reason to question DD3's authorization to use MOVA, Disney had the practical ability to investigate whether DD3 had the necessary rights to operate its core software. Disney argues that it used over 200 vendors on *BATB* and that it would have been impractical to conduct due diligence to confirm that all its vendors had the necessary rights to operate every piece of software on the production. However, Disney's ability to supervise this volume of vendors is a quintessential jury question that the jury could have reasonably resolved against Disney. *Cf. Fonovisa*, 76 F.3d at 262-63 (concluding that copyright plaintiffs had stated a claim for vicarious liability against a swap meet operator even though there were typically over 900 vendors selling goods[2]); *see also Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1053-55 (C.D. Cal. 2001) (concluding that a trade show operator's ability to "root out the infringing conduct" was a "triable issue of fact" where there were up to 450 vendor booths).

Moreover, Disney used only four visual effects vendors on *BATB*, of which DD3 was one of the two largest. Disney paid DD3 $31 million for its services, almost half of the film's visual effects budget. Additionally, Rearden introduced evidence at trial showing that other motion picture studios had contacted Perlman in the past to conduct due diligence and confirm that their vendors had all necessary rights to operate the MOVA software. The jury

---

[2] Brief for Appellee at 4, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (No. 94-15717), 1994 WL 16014410, at *4.

certainly could have reasonably determined that Disney, too, had the practical ability to conduct due diligence on the core software used by one of its largest vendors.

But the jury need not have relied only on Disney's general practical ability to supervise and police its vendors. At trial, Rearden also introduced two pieces of evidence showing that Disney had reason to further investigate DD3's use of MOVA *specifically*. First, Rearden introduced evidence of the public dispute over the Academy Award's Technical Achievement Award, including the article published in *The Hollywood Reporter* in which Perlman specifically claimed that DD3 lacked a license to use the technology. That article, published just a month before Disney entered into its *BATB* contract with DD3, reported that there was "a bitter disagreement over licensing of the [MOVA] technology" and that Perlman claimed he had "never granted Digital Domain a license" for MOVA's use on Disney's *Guardians of the Galaxy* movie. A reasonable jury could have inferred that Disney knew or should have known of the ongoing intellectual property dispute concerning the MOVA technology.

Second, Rearden introduced evidence at trial that a click-through Rearden copyright notice appeared on computer screens that were used to process data during the MOVA capture sessions attended by Condon and Gaub. It is true that Gaub and Condon testified that they did not *actually* see Rearden's copyright notice and only reviewed footage that had this copyright notice removed. However, the jury could have found this testimony not credible. Moreover, actual knowledge is not a required element of vicarious liability. *See, e.g.*, *Grokster*, 545 U.S. at 930 n.9; 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.04 (2025) ("Notably lacking from the [elements of vicarious

liability] is knowledge: Lack of knowledge that the primary actor is actually engaged in infringing conduct is not a defense . . . .”). Condon and Gaub could have seen the notice if they had diligently exercised their contractual rights to review DD3 work product. *See Napster*, 239 F.3d at 1023 (“To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent.”). Construing all evidence in the light most favorable to Rearden as the law requires on JMOL, the jury could have reasonably determined that Disney had the practical ability to see this notice and that this notice would have given Disney another concrete reason to investigate DD3’s authorization to use MOVA.

## B.  Practical Ability to Recognize DD3’s Conduct as Infringing

Disney also argues it is entitled to JMOL on the control element because, even if it had further investigated DD3’s right to use MOVA, it could not have recognized the use as infringement because the underlying MOVA ownership dispute was not resolved until after the final use of MOVA on *BATB*. We conclude that MOVA’s disputed copyright ownership does not insulate Disney from liability here.

Again, vicarious liability does not require actual or even constructive knowledge of infringement. *See, e.g.*, *Grokster*, 545 U.S. at 930 n.9. Disney argues that there is a difference between actual knowledge and the opportunity to recognize infringement. But even so, our case law has never suggested that, to be held vicariously liable for copyright infringement, a defendant must have an opportunity to know, *with certainty*, that the conduct in question infringes copyright. In *Napster*, we concluded that Napster had the practical ability to identify infringement based on user-uploaded song titles,

despite the inherent difficulties in confirming whether those uploads were in fact infringing. *See* 239 F.3d at 1027 (concluding that "Napster may be vicariously liable when it fails to affirmatively use its ability to patrol its system and preclude access to *potentially* infringing files listed in its search index" (emphasis added)). Indeed, we explicitly recognized that Napster may not be able to identify infringing content with certainty, given that uploaded files on the platform "are user-named and may not match copyrighted material exactly." *Id.* at 1024. Nevertheless, we concluded that "file name indices . . . are within the 'premises' that Napster has the ability to police." *Id.*

Here, too, the jury could have reasonably determined that Disney had the practical ability to identify that DD3's use of MOVA was *potentially* infringing. Had Disney reasonably investigated DD3's authorization to use MOVA when it initially contracted with DD3 in March 2015, it could have discovered that, since February 2015, DD3 had been involved in active public litigation with Rearden over ownership of the MOVA assets. Additionally, Disney could have discovered that Perlman had publicly claimed, in the February 2015 *Hollywood Reporter* article (which discussed an Academy Award related to technology used on Disney's own film, *Guardians of the Galaxy*), that DD3 lacked the necessary licensing rights to operate MOVA. Moreover, had Disney continued to monitor DD3's authorization to use MOVA during contract performance, Disney could have reasonably discovered Rearden's February 2016 copyright registration. Given that "registration of a copyright certificate constitutes prima facie evidence of the validity of [the] copyright," *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (citing 17 U.S.C. § 410(c)), this registration was strong evidence of

DD3's potential infringement. In sum, viewing the record as a whole, there was sufficient evidence from which the jury could have reasonably concluded that Disney had the practical ability to identify that DD3's use of MOVA was potentially infringing.

The mere fact that the copyright ownership dispute was not definitively resolved until August 2017, after *BATB* was released, does not insulate Disney from liability. To limit vicarious liability to situations where infringement can be identified with certainty would effectively preclude vicarious liability in any situation where copyright ownership is actively disputed or where the direct infringer has a nontrivial fair use defense. We are not persuaded that copyright infringement liability is so limited.

In general, "copyright infringement is a strict liability tort," *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021), and "although the problem of the innocent infringer was considered at some length in [congressional] hearings, the 1909 [Copyright Act] contained no broad provisions excusing innocent infringers," Alan Latman & William S. Tager, *Liability of Innocent Infringers of Copyright*, Study No. 25, in 2 Studies on Copyright 141 (Copyright Soc'y U.S.A. eds., 1963). This general principle applies with no less force to claims of vicarious liability. Even where the defendant cannot be certain whether the conduct at issue is infringing, "the innocent infringer . . . must suffer, since he, unlike the copyright owner, either has an opportunity to guard against the infringement (by diligent inquiry), or at least the ability to guard against the infringement (by an indemnity agreement . . . and/or by insurance)." *Shapiro*, 316 F.2d at 308 (citation omitted). Indeed, here Disney did *in fact* guard

against the risk of infringement by including an indemnification clause in its contract with DD3.

*          *          *

In sum, because we conclude that Rearden introduced sufficient evidence at trial from which the jury could find that Disney had "both a legal right to stop or limit [DD3's] infringing conduct, as well as the practical ability to do so," *VHT*, 918 F.3d at 746 (citation omitted), we reverse the district court's grant of JMOL in favor of Disney.

## IV.   JURY TRIAL RIGHT ON THE PROFITS REMEDY

Because we conclude that Disney is not entitled to JMOL, we next consider whether Rearden is entitled to a new jury trial on the issue of apportionment of profits. "The right of trial by jury as declared by the Seventh Amendment to the [United States] Constitution—or as provided by a federal statute—is preserved to the parties inviolate." Fed. R. Civ. P. 38(a). On appeal, Rearden does not challenge the district court's ruling that disgorgement of profits is an equitable remedy, and thus the Seventh Amendment does not guarantee a jury trial right on the issue.[3] However, Rearden argues that the district court erred in concluding that the Copyright Act does not provide a statutory jury trial right. We affirm the district court's ruling.

---

[3] The Seventh Amendment guarantees a litigant's right to a jury trial only for "suits at common law," which "include statutory claims that are legal (as opposed to equitable)." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074-75 (9th Cir. 2015).

## A.    Statutory Jury Trial Right Under the Copyright Act

Under 17 U.S.C. § 504(b), a copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Rearden argues that this language implicitly provides a jury trial right on the profits issue because the statutory text, read in the context of the Copyright Act's multiple remedy provisions, evinces "congressional intent to grant . . . the right to a jury trial" on this issue. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345 (1998) (quoting *Tull v. United States*, 481 U.S. 412, 417 n.3 (1987)).

This is a matter of first impression in our court, and, to our knowledge, no other circuit has squarely addressed the issue. The Federal Circuit has concluded that disgorgement of profits is an equitable remedy in the context of copyright infringement, patent infringement, trademark infringement, and trade secret misappropriation and thus a plaintiff has no Seventh Amendment jury trial right on these claims. *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1324-25 (Fed. Cir. 2018). However, the Federal Circuit has not addressed whether the Copyright Act provides a statutory right to a jury trial. *See id*.

Multiple district courts have considered this question, and the majority have concluded that the Copyright Act does not grant a jury trial right on disgorgement of profits claims. *See Assessment Techs. Inst., LLC v. Parkes*, No. 19-2514, 2022 WL 588889, at *2 (D. Kan. Feb. 25, 2022); *Bertuccelli v. Universal Studios LLC*, No. CV 19-1304, 2021 WL 2227337, at *2 (E.D. La. June 2, 2021); *Navarro v. Procter*

*& Gamble Co.*, 529 F. Supp. 3d 742, 747-49 (S.D. Ohio 2021); *Fair Isaac Corp. v. Fed. Ins. Co.*, 468 F. Supp. 3d 1110, 1113-14 (D. Minn. 2020). *But see Capture Eleven Grp. v. Otter Prods., LLC*, 724 F. Supp. 3d 1237, 1239-40 (D. Colo. 2023); *Huffman v. Activision Publ'g, Inc.*, No. 2:19-CV-00050, 2021 WL 2339193, at *3-5 (E.D. Tex. June 8, 2021). We agree with the majority of district courts and hold that § 504(b) does not provide a statutory jury trial right on the disgorgement of profits remedy.

In *Feltner*, the Supreme Court held that the Copyright Act does not provide a jury trial right for a separate infringement remedy: statutory damages under 17 U.S.C. § 504(c). 523 U.S. at 345-47. The Court explained that the language of § 504(c) "make[s] no mention of a right to a jury trial or, for that matter, to juries at all." *Id.* at 346. So too here. Section 504(b) is silent on the question of whether copyright plaintiffs have a right to a jury trial on the profits remedy. As Congress can, and frequently does, expressly provide for a statutory right to a jury trial, *see, e.g.*, 31 U.S.C. § 5323(g)(3)(B)(i); 28 U.S.C. § 2402; 42 U.S.C. § 1981a(c); 21 U.S.C. § 467b(a)(4), its silence here is strong evidence that it did not intend to confer a jury trial right.

However, congressional silence does not end our inquiry. In *Feltner*, the Court further explained that the repeated use of the phrase "the court" in § 504(c) "appear[ed] to mean judge, not jury." 523 U.S. at 346; *see id.* at 345-46 ("Statutory damages are to be assessed in an amount that '*the court* considers just.' Further, in the event that '*the court* finds' the infringement was willful or innocent, '*the court* in its discretion' may, within limits, increase or decrease the amount of statutory damages." (emphasis added) (quoting 17 U.S.C. § 504(c))).

Section 504(b), by contrast, lacks any such reference to "the court."

Rearden seizes on this difference, along with the following language in *Feltner* that expressly distinguishes § 504(b) from the Copyright Act's other remedy provisions, including § 504(c):

> [T]he other remedies provisions of the Copyright Act use the term "court" in contexts generally thought to confer authority on a judge, rather than a jury. *See, e.g.*, § 502 ("court . . . may . . . grant temporary and final injunctions"); § 503(a) ("[T]he court may order the impounding . . . of all copies or phonorecords"); § 503(b) ("As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords"); § 505 ("[T]he court in its discretion may allow the recovery of full costs" of litigation, and "the court may also award a reasonable attorney's fee"). In contrast, the Copyright Act does not use the term "court" in the subsection addressing awards of actual damages and profits, *see* § 504(b), which generally are thought to constitute legal relief. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) (action for damages for trademark infringement "subject to cognizance by a court of law"); *see also Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946) (copyright action for damages is "triable at 'law' and by a jury as of right"); *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d

1010, 1014 (7th Cir. 1991) ("little question
that the right to a jury trial exists in a
copyright infringement action when the
copyright owner endeavors to prove and
recover its *actual* damages"); 3 Melville
Nimmer & David Nimmer, *Nimmer on
Copyright* § 12.10[B] (1997) ("beyond
dispute that a plaintiff who seeks to recover
actual damages is entitled to a jury trial"
(footnotes omitted)).

523 U.S. at 346. Rearden argues that this reasoning supports
the conclusion that, because § 504(b) *lacks* a reference to
"the court," Congress intended to create a jury trial right for
both of the remedies provided for in § 504(b)—*i.e.*, both
actual damages and profits.

We disagree. Nothing in *Feltner* suggests that the lack of
a reference to "the court" would, on its own, be enough to
show congressional intent to create a jury trial right. And "in
the references cited for support" in *Feltner*'s discussion of
§ 504(b), "the Court provided explanatory parentheticals
related to only 'damages,' not 'profits.'" *Tex. Advanced
Optoelectronic*, 895 F.3d at 1325 n.11. Read in context,
*Feltner*'s discussion of § 504(b) was focused on the actual
damages remedy, not the profits remedy.

Indeed, the lack of the phrase "the court" in § 504(b) is
unsurprising. The Copyright Act's other remedy provisions
refer to remedial actions that have been long understood to
be under the remit of judges, not juries: injunctions,
impoundment, and the award of costs and attorney's fees. 17
U.S.C. §§ 502, 503(a)-(b), 505. Because § 504(b) provides
for actual damages—an unquestionably legal remedy to
which a Seventh Amendment jury trial right attaches—a

reference to "the court" in the subsection would be out of place. We thus do not read the lack of reference to "the court" in § 504(b) to imply a jury trial right for both forms of relief authorized under the subsection.

We also note that Congress enacted the Copyright Act's damages provisions against a historical backdrop that generally understood disgorgement of profits as a form of equitable relief. "Prior to the Copyright Act of 1909, . . . there had been no statutory provision for the recovery of profits, but that recovery had been allowed *in equity* both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (emphasis added). "In p[a]ssing the Copyright Act, the apparent intention of Congress was to assimilate the remedy with respect to the recovery of profits to that already recognized in patent cases." *Id.* at 400. To be sure, the Copyright Act underwent a major statutory revision in 1976, *see* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, and the current remedies provisions differ in material ways from the 1909 statute, *compare* Copyright Act of 1909, ch. 320, § 25(b), 35 Stat. 1075, 1081, *with* 17 U.S.C. § 504(b). However, the Supreme Court has reaffirmed that the profits remedy of § 504(b), as amended, remains best characterized as equitable relief. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 668 n.1 (2014) ("Like other restitutional remedies, recovery of profits is not easily characterized as legal or equitable, for it is an amalgamation of rights and remedies drawn from both systems. Given the protean character of the profits-recovery remedy, we regard as appropriate its treatment as equitable in this case." (internal quotation marks and internal citations omitted)). "Given [the profit remedy's] history as a form of equitable

relief, there is little reason to believe that Congress would have intended, by implication, to create a jury trial right when it added this relief to the statute" or when it amended the statute in 1976. *See Navarro*, 529 F. Supp. 3d at 748-49.

Indeed, the legislative history from the 1976 amendments further supports the conclusion that Congress intended the court, not a jury, to decide the profits remedy. The House Report accompanying the 1976 Copyright Act amendments explains that "[t]he language of [§ 504(b)] makes clear that only those profits 'attributable to the infringement' are recoverable; where some of the defendant's profits result from the infringement and other profits are caused by different factors, *it will be necessary for the court to make an apportionment*." H.R. Rep. No. 94-1476, at 161 (1976) (emphasis added). This reference to the role of "the court" in making apportionment determinations suggests that Congress intended for a judge—not a jury—to decide this issue.

Rearden's additional arguments do not persuade us otherwise. Rearden argues that the structure of § 504(b), which combines actual damages and profits in the same subsection, supports an implied jury trial right. *See also Capture Eleven*, 724 F. Supp. 3d at 1241; *Huffman*, 2021 WL 2339193, at *5 ("Pa[i]ring an unambiguously legal remedy with a 'protean' remedy—without a stronger indication that 'infringer's profits' is intended to be equitable—is a signal that Congress intended for the 'profits-recovery remedy' to take on a legal nature." (citation omitted)). However, the mere fact that Congress provided for a legal remedy and an equitable remedy in the same statutory subsection does not necessarily evince an intent for a jury to decide both remedies. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707-08

(1999) (concluding that 42 U.S.C § 1983 does not provide a statutory jury trial right despite its language that allows a party to seek relief through "an action at law, suit in equity, or other proper proceeding for redress").

Relatedly, Rearden notes that § 504(b) awards only profits that "are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). As copyright plaintiffs are entitled a jury trial on the actual damages under the Seventh Amendment, "as a practical matter, it may be difficult for a court to assess the extent to which the jury took the profits 'into account' in fashioning the actual damages award." *Navarro*, 529 F. Supp. 3d at 748-49. Although it is true that the district court may not know with certainty if or how the jury considered profit information in awarding actual damages, the district court can determine for itself the extent to which an actual damages award takes profits into account.

Finally, Rearden highlights that courts regularly submit the issue of profit disgorgement to juries in copyright cases. Indeed, multiple circuits—including our own—have adopted pattern jury instructions on calculating profit-based copyright damages. However, pattern instructions are nonbinding and may be erroneous. *See, e.g.*, *Bearchild v. Cobban*, 947 F.3d 1130, 1142 (9th Cir. 2020) ("The use of a model jury instruction does not preclude a finding of error." (internal quotation marks, citation, and alterations omitted)). The fact that courts have sent the profits question to juries in the past does not mean that parties are entitled to a jury trial on this issue.

Because "[n]othing in the language of" the Copyright Act "or its legislative history implies any congressional intent" to provide a jury trial right on the profits remedy,

*Tull*, 481 U.S. at 417 n.3, we ultimately conclude that Rearden's arguments are "too thin a reed to support an implied right to a jury trial on the issue." *Navarro*, 529 F. Supp. 3d at 749.

## B.   Procedural Error

Rearden also raises procedural challenges to the district court's ruling striking Rearden's jury demand as to the profits remedy. Specifically, Rearden argues that: (1) the court violated Federal Rules of Civil Procedure 38 and 39, and (2) the mid-trial timing of the ruling constitutes reversible error. These arguments are unavailing.[4]

Under Rule 38, "[o]n any issue triable of right by a jury, a party may demand a jury trial by" serving the other parties with a written demand, and such "[a] proper demand may be withdrawn only if the parties consent." Rule 39(a) requires trial by jury "on all issues so demanded" unless "(1) the parties . . . file a stipulation to a nonjury trial . . . ; or (2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial."

Rearden argues that, under these provisions, after originally consenting to Rearden's jury demand, Disney could not then unilaterally withdraw its consent. However, a "proper demand" that would require both parties' consent to withdraw is a demand on an "issue *triable of right* by a jury."

---

[4] Disney argues that Rearden has waived these procedural objections by failing to raise these issues before the district court. Because Rearden's procedural challenges raise questions of law and there is no deficiency in the record that would preclude our review, we exercise our discretion to excuse any waiver of these issues and address Rearden's arguments on the merits. *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) ("[T]he rule of waiver is a discretionary one." (quoting *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1517 (9th Cir. 1988))).

Fed. R. Civ. P. 38(b), (d) (emphasis added). As discussed above, *see supra* Section IV.A, disgorgement of profits is not an issue triable of right by a jury, as there is no Seventh Amendment or statutory jury trial right. *See Ross Dress for Less*, 39 F.4th at 1121 (explaining that if a party has "neither a constitutional nor a statutory right to demand a jury trial," "its demand . . . '[can]not have been made "as provided in Rule 38" for purposes of Rule 39'" (quoting *Craig v. Atlantic Richfield Co.*, 19 F.3d 472 (9th Cir. 1994))); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004) ("[Plaintiff] had no right to a jury trial and there is no restraint in the text of Rule 39 on the ability of a party to withdraw its consent to a jury trial that is not of right.").

Nor did the district court commit reversible error by striking Rearden's jury demand mid-trial. To be sure, it is preferable for the parties to know the factfinder on all issues before trial begins. *See, e.g.*, *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981) ("There are frequently significant tactical differences in presenting a case to a court, as opposed to a jury."). However, in the absence of demonstrable prejudice, declaring the jury advisory mid-trial is not a per se basis for reversal. *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994) ("[Plaintiff] alternatively argues that, even if it was not entitled to a jury trial, the trial court committed reversible error by declaring the jury advisory *after* the trial had actually started. We do not read Rule 39(c) . . . to compel such a conclusion."); *Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*, 195 F.3d 368, 375 (8th Cir. 1999) ("[F]ailure to give advance notice alone, absent some demonstrable prejudice to the complaining party, would not be a basis for reversal."); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 188 (1st Cir. 2000)

("[B]oth parties undoubtedly spent more time in preparation for trial and during trial in explaining the issues carefully than would have been expended if notice of the ruling had been given prior to trial. But this, in our opinion, is not sufficient reason for establishing a hard and fast time rule limiting the judge's discretion for ruling whether issues sound in equity or law.").

Here, Rearden has failed to demonstrate any prejudice. The district court never informed the jury that its verdict on profits was merely advisory and originally adopted the advisory jury's verdict before concluding that Disney was entitled to JMOL. Rearden has failed to explain any way in which it would have presented its case differently at trial had it known that the jury would be advisory. "[A]bsent some demonstrable prejudice," we conclude that it was not reversible error for the district court to declare the jury advisory after Rearden had presented much of its case-in-chief. *Merex*, 29 F.3d at 827.

\*        \*        \*

Because we conclude that the Copyright Act provides no statutory jury trial right on the issue of disgorgement of profits, and we find no reversible procedural error in the district court's ruling, we affirm the district court's order striking the jury demand on the issue of disgorgement of profits.

## V.    EVIDENTIARY RULINGS

Finally, Rearden challenges two of the district court's evidentiary rulings. First, Rearden argues that the district court abused its discretion in granting Disney's motion to exclude the testimony of Rearden's damages expert on the issue of apportionment of profits. Second, Rearden argues

the district court abused its discretion in excluding evidence of DD3's agreement to indemnify Disney. We find neither argument persuasive.

## A.    Profits Apportionment Testimony

The district court excluded the profits apportionment testimony of Rearden's damages expert both because key assumptions in the expert's apportionment testimony lacked an "identifiable methodology" and because the expert failed to explain how his professional experience rendered him qualified to conduct the apportionment analysis. Ultimately, "[t]he district court must ensure that expert testimony, whether it is based on 'professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035-36 (9th Cir. 2010) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). In light of the expert's deposition testimony, in which he failed to provide a cogent explanation of his methodology and repeatedly conceded that he lacked knowledge about MOVA technology, the district court did not abuse its discretion in concluding that the expert's testimony lacked appropriate rigor and excluding the expert's opinion on this subject.

## B. Indemnification Evidence

Nor did the district court abuse its discretion in excluding evidence about DD3's contractual duty to indemnify Disney's production affiliate under Federal Rule of Evidence 403. To be sure, the indemnification agreement was probative of the credibility of DD3 witnesses. *See In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1014 (9th Cir. 2008) ("Evidence of indemnification is generally inadmissible but may be used to show prejudice or bias of a witness."). However, the district court conducted a Rule 403 balancing analysis and concluded that the indemnification agreement should be excluded "because the risk of confusion or unfair prejudice outweigh[ed] any probative value." On this record, we do not find this ruling to be an abuse of discretion, *i.e.*, "illogical," "implausible," or "without support in inferences that may be drawn from the facts in the record." *United States v. Espinoza*, 880 F.3d 506, 511 (9th Cir. 2018) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

## VI. CONCLUSION

For the foregoing reasons, we reverse the district court's order granting JMOL in favor of Disney on Rearden's vicarious copyright liability claim. However, we affirm the district court's orders striking the jury demand on disgorgement of profits, excluding the testimony of Rearden's damages expert on apportionment of profits, and excluding the indemnification agreement between Disney and DD3. Accordingly, we deny Rearden's request for a new jury trial on the issue of apportionment of profits.

**AFFIRMED in part; REVERSED in part; and REMANDED**.